WATKINS *et al. v.* MARTIN *et al.*

(Division A. April 17, 1933. Suggestion of Error Overruled June 12, 1933.)

[147 So. 652. No. 30519.]

Gilbert & Cameron, of Meridian, for appellants.

D. M. Watkins, of Hattiesburg, for appellants.

**Wilbourn, Miller & Wilbourn,** of Meridian, for appellees.

Argued orally by **C. V. Gilbert**, for appellant, and by **R. E. Wilbourn**, for appellee.

**Cook, J.**, delivered the opinion of the court.

The appellants, a sister, brother, and nephew of S. W. Martin, deceased, filed their bill in the chancery court of Lauderdale county against Mrs. Willie Mae Bounds, a niece, and the appellee T. E. Martin, a brother of the said S. W. Martin, seeking to cancel a deed executed by S. W. Martin to T. E. Martin on February 8, 1932, eight days before his death. The ground upon which the cancellation of the deed is sought is that the fiduciary relations which existed between T. E. and S. W. Martin at the time of the execution thereof and for many years prior thereto, made the deed prima facie fraudulent and void. The cause was tried on bill, answer, and proof, and a decree was entered dismissing the bill, from which this appeal was prosecuted.

The pleadings are very lengthy, and we shall only set out such brief outline of the facts alleged and proved as appear necessary to make apparent the issues involved and to be decided.

S. W. Martin was a bachelor, and he and his brother T. E. Martin were partners first as cattle dealers, and later in the mercantile business and in land holdings, for a period of about thirty-five years. For many years S. W. Martin lived in the home of T. E. Martin practically as a member of the family; the home being owned jointly

by the two brothers. The first relations of these brothers as partners were in the cattle business. This business prospered, and much of the profits thereof was invested in real estate; the title being taken in the names of T. E. and S. W. Martin. They also accumulated the sum of twenty-five thousand dollars in cash, which, at the time of the death of S. W. Martin, was on deposit in bank, and evidenced by time certificates of deposit, payable to T. E. Martin and/or S. W. Martin. After the cattle business was closed out, these brothers went into the mercantile business under the firm name of Martin & Cooper, in which firm S. W. Martin and T. E. Martin owned one-half interest and O. A. Cooper the other half interest; and this business was in active operation at the time of the death of S. W. Martin.

Throughout the entire period of the conventional relationship of partners which existed between T. E. and S. W. Martin, which covered a period of about thirty-five years, there was a very high degree of mutual confidence and intense affection between them. T. E. Martin was a man of exceptional business ability, and throughout the partnership was principally the outside or contact man, in that he attended almost exclusively to the purchases and trading, the disposition, expenditure, and investment of partnership funds, the assessment and payment of taxes, and the management of the real estate holdings of the partnership. Although S. W. Martin was a man of sound business judgment, he was of retiring disposition, and, for the most part, contented himself with the discharge of the internal affairs of the partnership, and reposed absolute trust and full dependence in his brother, T. E. Martin.

Some days or weeks before he was stricken with a fatal illness, S. W. Martin's health began to fail. Mrs. T. E. Martin testified that about two weeks before his death, when she was discussing a certain will contest in the presence of S. W. Martin and her husband, S. W. Martin stated that, if anything happened to him, "he

aimed to have everything fixed so it would not give Tom any trouble; that Tom helped him to make it, and he thought he was entitled to it." Mr. Cooper, a partner in the mercantile business of Martin & Cooper, testified that about a week before S. W. Martin was taken seriously ill he stated to him (Cooper) that before he died he wanted to fix matters so Tom would not have any trouble over what property he left; that they had worked together and made it, and he (Tom) was the one that was entitled to it.

On Saturday before the deed in question was executed on Monday, S. W. Martin became seriously ill, and Dr. Bourdeaux was called to attend him. On Monday following, Dr. Tatum was called in consultation, and these physicians were requested by T. E. Martin to determine whether the patient was in condition to make a will or transact business; and, after their consultation, they advised T. E. Martin that, in their opinion, he was capable of executing a will or transacting business. The nurse who was attending the sick man testified that at some short time, not definitely fixed in the record, before the execution of the deed in question, T. E. Martin came to the bedside of his sick brother and said to him: "You are a very sick man. In case anything happens to you, what do you want done. We have been associated together, and whatever you want done, I will do it. Do you want me to have it, or do you want it divided up. I will do whatever you want done;" and that S. W. Martin replied: "You may have it."

T. E. Martin had an attorney to prepare a draft of a deed conveying to himself, S. W. Martin's interest in all the real and personal property owned by them jointly; but whether this was done before or after the physician's advice to him that S. W. Martin was capable of executing a will or transacting business does not clearly appear from the record. That night relatives of the sick man, including his brother John M. Martin, were in the home of T. E. Martin where S. W. Martin was seriously ill,

but nothing was said to them about the proposed execution of the deed. After they left the home, between nine-thirty and ten-thirty P. M., the nurse who was attending the sick man notified T. E. Martin that his brother was awake, and thereupon T. E. Martin requested two neighbors who were presented to go with him for the purpose of witnessing a paper to be executed by S. W. Martin. These two witnesses testified that, after they entered the room of the sick man and exchanged greetings with him, T. E. Martin said to his brother, "Sam, I have these papers fixed;" that S. W. Martin then asked how he had fixed them, whether it was a will and whether he had fixed it so they could give him no trouble; and that T. E. Martin told him that it was a deed, and that he had made it all to himself. They testified that S. W. Martin then asked for a pen and his glasses, and told the nurse where she would find the glasses; that he then took the deed and looked at it for a short while, but they were unable to say whether he read it; that he then signed the deed, and they signed it as witnesses and delivered it to T. E. Martin. These two witnesses, as well as the nurse who was present when the deed was signed, testified that, although S. W. Martin was then a very sick man, he was apparently in full possession of his mental faculties. He lived eight days after the execution of this deed. Shortly after his death, the execution of the deed was proved by the affidavit of one of the subscribing witnesses; and it was filed for record. The value of the personal property conveyed was in excess of twenty-five thousand dollars, but the value of the large amount of real estate conveyed, a description of which was set forth in the appellee's answer to the bill of complaint, was not shown, but the amount of this real estate would indicate a valuation of considerable magnitude.

In addition to the fiduciary relation which existed between T. E. Martin and S. W. Martin as partners for many years, there was the very close mutual confidence and affection between them which established the exist-

ence of a fiduciary relation between them in fact; and upon the facts we think this case is controlled by the principles announced in the case of Ham v. Ham, 146 Miss. 161, 110 So. 583, and the authorities there cited. In most essential respects the facts in the Ham Case are practically parallel with the facts in the case at bar. In the Ham Case it was shown that, before the execution of the deed in question, C. M. Ham, the grantor, consulted with his attorney and received advice from him as to the character of the instrument which should be executed, in order that he might be protected in the receipt of an annuity which his brother was to give him for the property conveyed, and, when the deed was drawn up and submitted to him, the said C. M. Ham suggested to the attorney certain changes to be made therein. In the case at bar, the record wholly fails to show that the grantor had any competent and independent advice, or any advice whatever from any one disconnected from the grantee; and in this respect, the facts of this case are stronger against the validity of the deed than were the facts in the Ham Case. As was said in the Ham Case, the "rules governing deeds between parties to a fiduciary relation in fact are the same as those where the parties occupy a conventional fiduciary relation, as to presumption of fraud." The evidence in this case establishes the existence of a fiduciary relation in fact between the parties to the deed, making it prima facie fraudulent. In the case of Bourn v. Bourn, 163 Miss. 71, 140 So. 518, the principles announced in the Ham Case, supra, were reaffirmed and followed. The burden was on the appellee to overcome the presumption of invalidity of the deed, and we think he failed to produce evidence sufficient for that purpose.

The decree of the court will therefore, be reversed, and the cause remanded.

Reversed, and cause remanded.