## EDWARDS, ADMR. *v.* JEFCOAT

No. 40373             February 4, 1957             92 So. 2d 342

*Wm. Haralson,* Hattiesburg, for appellant.

*Paul G. Swartzfager,* Laurel, for appellee.

ROBERDS, P. J.

O. R. Edwards departed this life August 19, 1955. His heirs were his nine adult children and his widow, who was his second wife. He owned sixty-one acres of land, with improvements thereon, located in Jones County, Mississippi, which he and his wife occupied as their homestead. Also, to the joint credit of himself and Mrs. Lois Jefcoat, one of his children, was the sum of $5,769.17 in Commercial National Bank & Trust Company of Laurel, Mississippi. This contest is over the ownership of the money in that joint account. Jack Edwards, administrator with the will annexed of the estate of O. R. Edwards, deceased, filed a petition in this cause, asserting that Edwards was induced to create this joint account between himself and Mrs. Jefcoat by undue influence and fraud practiced upon him by Mrs. Jefcoat, and also that O. R. Edwards did not have the mental capacity to create such an account. Mrs. Jefcoat in her answer, denied the charges made in the petition of the administrator, and asserted that Edwards deposited the money in the joint account so that someone could draw checks thereon in payment of his drug, hospital and doctor bills in case he became unable to do so, and also with the intent that she, Mrs. Jefcoat, would be the owner, as surviving joint tenant, of whatever balance of this fund might remain upon his demise.

Considerable testimony was taken upon the questions raised in the pleadings. The chancellor found that no

fraud or undue influence brought about the creation of the joint account and that O. R. Edwards had the mental capacity to understand the nature and effect of its creation. He decreed that the balance to the credit of the account, to-wit: $5,769.17 was the property of Mrs. Jefcoat as the surviving joint tenant. From the findings and decree of the chancellor the administrator appealed to this Court. He says that both the findings of fact and the conclusions of law on the part of the chancellor were erroneous, and urges us to reverse the chancellor and award the money to him as administrator for distribution among the beneficiaries in the will of O. R. Edwards, the beneficiaries being the nine children and the widow of O. R. Edwards, each being entitled to an equal part of his estate.

This requires a brief review of the pertinent testimony applicable to the issues.

The initial deposit was made in the joint account December 8, 1954. Another deposit of $3,050.00 was added May 28, 1955. As stated, O. R. Edwards died August 19, 1955. It appears other deposits were made during his lifetime but this is not clear from the record. In the remainder of this opinion the use of the word decedent means O. R. Edwards and the use of the word administrator means Jack Edwards.

The administrator introduced a number of witnesses. He testified he was a brother of Mrs. Jefcoat; a son, heir and beneficiary in the will of O. R. Edwards, deceased. Witness was 34 years of age and lived at Hattiesburg. He testified that Mrs. Jefcoat was 49 years of age; her home was within about five miles of that of decedent, who was 74 years of age when he died. After the burial some, and maybe all, of the children of decedent had a meeting. Mrs. Jefcoat indicated she would divide out among the heirs the deposit in the joint account. She said she wanted time within which to think about the matter. She was upset over the death of her

father. Some two or three weeks later the witness called Mrs. Jefcoat and she yet was not decided as to whether the other heirs should share in the deposit. ''She never did get around to it''. Witness further testified that ''The banker told us, everybody concerned, that it was her money.'' The witness was reminded by counsel for Mrs. Jefcoat that he had not testified to any fact showing the exercise of undue influence upon decedent, and he said he based his claim on his inference that Mrs. Jefcoat had assented that the joint deposit be paid the administrator. He said decedent, in his last days, was forgetful; that he would carry a large sum of money on his person and ask the witness to count it. At one time he thought Chester Edwards, another son, had taken possession of the money in the joint account. That was not true. Decedent went to a hospital in New Orleans. He had asthma, a stomach trouble and a heart ailment. He had a throat operation at New Orleans, and also, while there, Chester Edwards, brother of the witness, prepared a will for decedent, which he executed, and which divided equally between his nine living children and his widow the property he might own at his demise. This was the will admitted to probate August 31, 1955, wherein petitioner, Jack Edwards, was appointed administrator with the will annexed.

Dr. C. A. Kennedy was a practising physician at Taylorsville, about five miles from the residence of the decedent. He had known decedent some fifteen years. He treated him in the spring of 1954. About that time decedent again went to New Orleans for treatment. Witness again treated him in August, -1955, just before he died. Witness was asked: ''All right. Well, let's put it this way, then: In the spring of 1954, when you last saw him, until you did see him immediately prior to his death, was there anything wrong with Mr. Edwards mentally? He replied ''* * * well, up until that time I would figure his mind was practically the same as it had been.''

"Q. Had always been? A. Has always been." He was asked if Edwards was not a man of strong mind—a strong determination, and replied "Well, he was pretty well fixed in his ways. Q. That's right. Relied on his opinion solely? A. Yes." Witness was asked if decedent could have been persuaded by his doctor, lawyer, preacher, or anyone else, to do something he didn't want to do, and replied, "Well, I always figured him that kind of person." He was asked if decedent "was perfectly competent to take care of his business and to know what he was doing in regard to his business", and replied "Well, I would have risked him right up to his death."

Chester P. Edwards testified. He lived at Baton Rouge. He was a son of O. R. Edwards. He and O. R. Edwards started in the insurance business in 1920 and the relation continued to within three months prior to the death of O. R. Edwards. Witness was general agent for two states and O. R. Edwards "was a district man under me". In October, 1952, O. R. Edwards went to the hospital in New Orleans. He told the witness he wanted to make a will. Witness prepared it for him and O. R. Edwards executed it. He wanted his property divided equally between his children and his widow. This the will did. It was delivered to Mrs. Davis, a sister of the witness, who had it at the time of the death of O. R. Edwards. O. R. Edwards had a throat and stomach operation at New Orleans. Witness says decedent would switch his money from bank to bank. He did that before creating the joint account here involved. At one time decedent suggested the witness might have taken money from under his pillow, which was not true. He said Mrs. Jefcoat was very devoted to decedent; that she used her automobile and drove him to different places as he wished to go. He said "If it hadn't been for her he would have been dead several years ago—if it hadn't been for her." Decedent looked to Mrs. Jefcoat to care for him. He said he had known of occasions

when Mrs. Jefcoat's automobile had to be pulled out of "bog holes" while procuring wood and water for decedent. He said Mrs. Jefcoat volunteered her care of and services to decedent, and did it "without any request". He thinks the joint account was created so that it would be available for payment of obligations of decedent.

On cross examination he said he was in the insurance business with decedent for thirty-five years; that decedent was a man of strong will and positive opinions; that " * * he would go for advice and then he would do as he derned pleased". He gave it as his opinion that Mrs. Jefcoat would not unduly or improperly influence one or be guilty of a fraud. However, he indicated that if she insisted on being the sole owner of the balance of the joint account, this might alter his opinion.

Lester Welch lived on an adjoining farm to the homestead of decedent. He testified that decedent had been ill sometime. He thought about five months before his death decedent's mind was getting weaker. Decedent asked the witness, some three or four months before he died, if the father of witness was still living. He repeated the inquiry two or three times on the same occasion. The father was then dead and decedent knew that. On cross examination this witness said decedent was a man of peculiarities, but to within three or four months of his death his mind was all right. Witness said decedent knew how to take care of himself in a business way—certainly to within three or four months of his death.

John Edwards was a brother of Mrs. Jefcoat and a son of decedent. He testified he understood from what was said at the meeting after the burial of decedent that Mrs. Jefcoat had consented to a division of the money among the heirs of decedent, and also including within the distribution two grandchildren of decedent, whose father had previously died. However, this wit-

ness further said, respecting the ownership of the deposit, "that it was hers to do what she wanted to with it."

John Edwards, the next witness, is a son of decedent and a brother of Mrs. Jefcoat. He lives in Shreveport, La. He came to the funeral and was at the meeting after the burial. He understood Mrs. Jefcoat had agreed to an equal division of the joint account money between the children and widow of decedent. However, he testified that Mrs. Jefcoat said "that it was hers to do what she wanted to with it".

Mrs. Ethel Merl Parker testified. She is a daughter of decedent and a sister of Mrs. Jefcoat. She was asked what Mrs. Jefcoat said about dividing the money and replied, "Mrs. Jefcoat said she would divide it when the day come to divide it."

S. H. McDonniel testified he was a neighbor of decedent; that they went to Sunday School together; decedent's health was failing for about a year before he died. Decedent was absent-minded. "He would ask you one thing may be, and in a few minutes ask you the same again." Decedent was a good business man and had a mind of his own about his business matters.

Mrs. Mattie Davis lived at Laurel. She was a child of decedent and a sister of Mrs. Jefcoat. She visited decedent the last year of his life. Mrs. Jefcoat usually carried decedent to the hospital. Witness was present at the hospital a number of times when decedent was there. Decedent always paid his own bills. She knows nothing of the joint account. She thinks its purpose was to enable Mrs. Jefcoat to draw checks thereon to pay bills of decedent in case he was not able to do so himself.

Mrs. Norman J. Bourgeois married a son of decedent. Mrs. Jefcoat told her that she thought the two boys of the witness should share in the joint account.

At this point the administrator rested. Mrs. Jefcoat then placed five witnessees upon the stand.

D. W. Maddox testified. He was then and had been for twelve years president of Commercial National Bank & Trust Company. He well knew decedent and Mrs. Jefcoat. He remembered the occasion when the joint account at his bank was created. Decedent told him he wanted the money placed in the joint account of himself and Mrs. Jefcoat. Witness produced a joint deposit slip with the joint agreement thereon. He explained the agreement to decedent and Mrs. Jefcoat, expressly telling decedent that Mrs. Jefcoat "would get what was left in the account" upon his death. Decedent understood that. Witness had known decedent in a business way for twenty-five years. Decedent told him he wanted to create the joint account. He made out the joint account, containing the survivorship agreement, the effect of which he had explained to the parties, and decedent and Mrs. Jefcoat both signed it, and the money was deposited to the joint account. Decedent did remark he wanted the account so that Mrs. Jefcoat could draw checks thereon.

George Murray testified he had known decedent a long time. They lived close to each other. Decedent was amply able to handle and transact his own business. That was true in December, 1954. He and decedent were talking on one occasion and someone mentioned a mineral lease bringing $100 per acre, and decedent replied that at that price he could retire. Decedent said he was fortunate; that statistics showed he had lived longer than eighty percent of the people. He said Mrs. Jefcoat cared for and looked after decedent during his illness in his latter years. He said, "Yes, sir, she taken care of him as good as it is possible for a woman to do." In response to a question as to whether Mrs. Jefcoat could have influenced decedent he said "it would not have succeeded if she had tried because he taken care of his own business * * He was that kind of man. Nobody could influence him when it come to his own business.

Yes, sir, he would tell you quickly that it was a late hour for you to try to get into his business.'' He explained that Mrs. Edwards, wife of decedent, could not drive an automobile, and she was in rather bad health herself.

Tommy Pickering testified that for sometime he operated a store in Hebron, a short distance from the home of decedent. Both decedent and Mrs. Jefcoat had traded at his store. Several times, at the request of decedent, he had called Mrs. Jefcoat over the telephone and she had driven into Hebron and carried decedent home. That happened once about a month before he died. ''Mrs. Jefcoat always brought him to the store in her car or picked him up.'' He said decedent attended to his own business. He never noted any act indicating that Mrs. Jefcoat was trying to influence him. He never saw any of the other children helping, or ministering to, decedent.

Vaster Jefcoat was the husband of Mrs. Jefcoat. He testified. He was present when the joint account was created. On the way to the bank decedent remarked, ''Lois, I have got a little money, and I am giving it to you. I am going to give it to you to take care of me. You are the only one that comes around me and has anything to do with me, and it ain't only starting now. You have been doing that for years and I am giving you my money this morning''. Mr. Maddox, president of the bank, read the joint agreement on the back of the deposit slip, and explained it to decedent. Maddox told them the remaining money in the account upon the death of decedent would be the property of Mrs. Jefcoat. He said Mrs. Jefcoat did not try to influence decedent; that she could not have done so had she tried. He said, ''No, sir, you didn't tell that old man what to do, he told you what to do.'' He said decedent thoroughly understood the money in the account at his death would be the property of Mrs. Jefcoat. He under stood that either he or Mrs. Jefcoat could draw it out while both were living.

On cross examination he said decedent remarked "Lois, I am going to give this money to you to take care of me—I may live ten years or I may live a week, but it is to take care of me as long as I live". He was asked "He didn't say I am giving you this money for having taken care of me, did he? A. No."

Eugene Holifield was a neighbor of decedent and had known him for many years. He said decedent knew how to take care of himself and his business. He had the ability to understand the nature and effect of the joint account made in December, 1954. He said "I have been carrying Mr. and Mrs. Edwards to church for years." He also said Mrs. Jefcoat usually carried them to church.

The foregoing was the evidence in the case. It will be noted that five of the witnesses who testified for the administrator were children and heirs of decedent and beneficiaries under his will. No objection was made to their testifying to establish their own claims against the estate of a deceased person.

Was this evidence sufficient to support the findings and conclusions of the chancellor?

It is noted here that the administrator expressly states that he does not claim that Mrs. Jefcoat was guilty of any fraud. That question is out of the case on this appeal.

That leaves the questions of lack of mental capacity and undue influence.

■■ ■ As to capacity, some of the witnesses said he was an eccentric man; that his memory wasn't good, and that he imagined someone had gotten possession of his money. These facts weigh heavily in favor of the administrator. On the other hand, a number of witnesses testified that his mental capacity, when the deposit was made, was as good as it had been; several, even some for the administrator, testified that his mental capacity was good up to about the time of his demise. No doubt the chancellor gave great weight to the testimony of

Mr. Maddox, the president of the bank. Whether decedent had the capacity to understand the nature and effect of creating the joint deposit should be tested by his condition at the time he did it. Mr. Maddox explained to him the meaning and result of a joint deposit. Mr. Maddox said he understood all of this—at least Mr. Maddox thought so, or he would not have permitted the joint account to be made at his bank. In addition to this, it is noted that on May 28, 1955, decedent entered into a mineral lease on his homestead. That was four and a half months after he made the deposit. It would appear that a higher degree of intelligence was required to properly evaluate the elements entering into this lease agreement than was required to understand the nature and effect of the joint deposit. Yet, it is not claimed by the administrator that decedent lacked the mental capacity to enter into this mineral lease. Indeed, the consideration for that lease, $3050.00, was deposited in this joint account, and constitutes a part of the money the administrator seeks to recover.

In our opinion the weight of the evidence supports the finding of the chancellor on the question of mental capacity.

Administrator, as his main contention, says the chancellor erred in not finding that the proof showed that decedent created the joint account as a result of influence unduly exercised upon him by Mrs. Jefcoat. He does not point out any specific act or effort on the part of Mrs. Jefcoat to unduly induce O. R. Edwards to create the joint account. He says that when he rested his case he had shown that O. R. Edwards and Mrs. Jefcoat were parent and child; that a fiduciary relationship existed between them; that the deposit was created, and that this established a presumption that the joint account was the result of undue influence, and that the burden was then cast upon Mrs. Jefcoat to overcome such presumption, and that she failed to do so. The administrator invokes

this rule: " * * where facts are shown, other than the mere relation of parent and child, establishing between the parties a confidential relation in which the child is the dominant party, a conveyance from the parent to the child is presumed to be tainted with undue influence and the burden is upon the child to show the bona fides of the transaction." 24 Am. Jur., Sec. 100, pages 745-746. Administrator also cites and relies upon Ham v. Ham, 146 Miss. 161, 110 So. 538; Watkins, et al v. Martin, et al, 167 Miss. 343, 147 So. 652; Lindeman's Estate, et al v. Herbert, et al, 188 Miss. 842, 193 So. 790, in which the fiduciary rule is stated in different language. Neither of the cited cases is applicable on its facts to the case at bar. The facts showing fiduciary relationshiup were much stronger in all of them than in the present case. And we do not deem it necessary to undertake to deduce from them a restatement of the fiduciary rule. We use as a measure or standard the above quoted limited rule relied upon by the Administrator. And so tested we do not think the proof of administrator ever rose to the point of showing that the joint deposit was not effective. It is not shown that any fiduciary relationship existed between Mrs. Jefcoat and O. R. Edwards as to business matters. There was no proof by administrator that business matters were ever mentioned or discussed between them. All that was shown was that Mrs. Jefcoat was devoted to her father and administered to his needs and cared for him as best she could. She did not live in the same house with him. Nor is it intimated that she in any manner dominated her father or induced him to do any act contrary to his own desires or wishes. When administrator rested his case we do not think his proof had the effect of switching the burden to Mrs. Jefcoat to rebut an inference of undue influence. However, if it did, she successfully met that burden—at least the chancellor had ample evidence to so conclude. Events surrounding the creation of the joint account were sufficient to do that.

The facts as to that are not disputed. They happened at the very time the account was created. Mr. Maddox explained to the parties that the money remaining in the account at the death of O. R. Edwards would be the property of Mrs. Jefcoat. O. R. Edwards understood that. He acted in the light of that knowledge. If it be said, as some of the rules announce, that under certain circumstances, the duty is upon the child to show the parent had independent advice, then the information imparted by Mr. Maddox, under the circumstances, supplied that requirement. Even though the proof of a complainant when he rests his case may be of such character and probative value as to justify an inference of undue influence and thereby render it necessary, as a procedural step, that defendant overthrow the inference, it is still the rule that the ultimate burden rests upon a complainant to establish the facts, at the close of a completed trail, entitling him to relief. The chancellor was amply justified in his finding on the question of undue influence.

Finally, it is urged that the proof shows that O. R. Edwards, in creating the joint account, only intended the money would be availabe to meet his own needs—not to vest any title in Mrs. Jefcoat. Statements of some of the witnesses, as above set out, standing alone, carry that inference. Testimony of other witnesses tends to prove he had both the intention to have the money available for his needs and vest title in Mrs. Jefcoat. In addition to this, it is not disputed, as above stated that at the very time he created the joint account he knew the written agreement and the deposit of the money vested title in Mrs. Jefcoat. Mr. Maddox, the president of the bank, impressed those facts upon him. In Stewart, Admx., v. Barksdale, Gdn., 216 Miss. 760, 63 So. 2d 108, defining the effect of a joint deposit, this Court said, "The instrument set out above created a joint tenancy with right of survivorship in clear and unambiguous terms and was sufficient to vest title in appellee. This

Court upheld a similar agreement in Stephens, et al v. Stephens, 193 Miss. 98, 8 So. 2d 462; also Duling v. Duling's Estate, 211 Miss. 465, 52 So. 2d 39.''

Affirmed.

*Hall, Lee, Holmes* and *Ethridge*, JJ., concur.