515 So.2d 1183 (1987)
A. Dee Lewis MULLINS, et al.
v.
Mary RATCLIFF, et al.
No. 57278.
Supreme Court of Mississippi.
November 25, 1987.
*1185 K. Maxwell Graves, Jr., W.W. Hewitt, Meadville, Constance L. Johnson, Kitchens & Pickard, Hazlehurst, for appellant.
H.B. Mayes McGehee, McGehee, McGehee & Torrey, Meadville, for appellee.
Before DAN M. LEE, P.J., and PRATHER and ROBERTSON, JJ.
ROBERTSON, Justice, for the court:

I.
Today's appeal presents the all too familiar story of family members charging siblings with use of undue influence to obtain a larger than fair share of the family property. Inevitably such cases turn on their facts.
On the totality of the circumstances presented in the present record, the grantee sister convinced the trier of fact by clear and convincing evidence that she had not employed undue influence to obtain the disputed deeds. Because we find those findings beyond our authority to disturb and for the other reasons set forth below, we affirm.

II.

A.
At issue are three conveyances from the late James Madison (Matt) Lewis to his youngest sister, Mary Lewis Ratcliff, transferring in the aggregate one hundred acres of land in Franklin County. The first two conveyances were in 1946 and 1950, respectively, and each conveyed twenty acres. The last conveyance, reflected by *1186 two deeds  one in 1966 and another in 1967  conveyed the remaining sixty acres. Two of Matt's sisters, A. Dee Lewis Mullins and Sarah Lewis Smith, challenge Mary Ratcliff's right and title to the property.
The story's skeleton is a series of transactions involving Matt Lewis and other family members, taking place beginning on December 26, 1942, and ending on April 2, 1968. Prior to 1942 George Washington (G.W.) and Mary Jane Lewis owned 970 acres in Franklin County. On December 26, 1942, the Lewises divided and conveyed all but eighty acres to their eight children, in these amounts:

 Matt Lewis 100 acres
 Holmes Lewis 140 acres
 Iva Lewis Murray 120 acres
 Sarah Smith 100 acres
 Julia Flowers 120 acres
 A. Dee Mullins 100 acres
 George Harrison Lewis 120 acres
 Mary Ratcliff 90 acres

On April 30, 1946, without consideration, Matt Lewis executed and delivered a warranty deed to his sister, Mary, giving her twenty of his one hundred acres. Mary and her husband, Lenoir, immediately built their home on that land. On February 14, 1950, Matt conveyed to Mary, also by warranty deed and without consideration, another twenty acres adjacent to the first twenty. Matt was living at home with his parents when each of these deeds was executed. His mother, Mary Jane, died in January, 1956, and his father died two years later in January, 1958. In May, 1958, Matt went to live with Mary and Lenoir.
Approximately seven months later, on February 5, 1959, Matt filed a petition in Chancery Court of Franklin County requesting that a guardianship of his estate be established. Matt cited as reasons physical handicaps, not mental ones. He was joined in the petition by, among others, the Appellants, A. Dee and Sarah, and the Appellee, Mary. The petition stated in pertinent part:
Petitioner and Co-Petitioners would show that Petitioner, James M. Lewis, is physically handicapped having been stricken in early childhood with a disease which renders him physically incapable of walking and that he is in actuality a complete invalid. That he is mentally alert and aware of events and occurrences but physically he is unable to attend to himself or his business affairs.
The petition went on to state that those who had joined in the petition had, on January 30, 1959, executed an oil, gas and mineral lease covering their interest in minerals on the 970 acres, that Matt was also interested in executing such a lease but was physically unable to do so or to handle the proceeds, and that Mary, with whom he was living, would be a "fit and suitable" guardian. The petition was signed and sworn to under oath by Matt, A. Dee, Sarah and Mary, among others. The guardianship was established on February 5, 1959, and was not formally closed until May 6, 1968. As soon as she was appointed and qualified, Mary was granted authority as Matt's guardian to execute an oil, gas and mineral lease. Mary made regular accountings of assets received in connection with the lease and expenditures made for and on behalf of Matt throughout the guardianship period.
On May 16, 1966, eight years after Matt moved in with Mary and two years before the guardianship was closed, the last sixty acres of Matt's 100 acres, upon which the old family home was situated, were conveyed by warranty deed to Mary. That deed is signed "Mary Lewis Ratcliff GDN." Approximately one year later, on March 29, 1967, Matt again conveyed the same sixty acres to his sister Mary. This time the deed was signed by Matt's mark. In both the 1966 and 1967 deed Matt reserved a life estate. The deed of 1967 is the operative deed and supersedes the 1966 deed.
On April 2, 1968, one month before the guardianship was terminated, G.W. and Mary Jane's remaining eighty acres were divided among several family members. Because G.W. and Mary Jane died intestate, each of their eight children was entitled to ten acres. In 1968 only seven children were alive. Holmes Lewis had died in *1187 1947 leaving his wife and four children who were entitled to his one-eighth share. Apparently, everyone agreed to deed forty acres to the Appellants, A.Dee and Sarah, and forty acres to Matt. Matt (and others) signed the deed to A.Dee and Sarah. A.Dee, Sarah, and Mary (and others), signed the deed to Matt. These deeds, as well as all of the aforementioned deeds, were duly acknowledged and filed in Chancery Court. On May 6, 1968, the guardianship of Matt's estate was formally closed and Mary was finally discharged as guardian.
Matt lived with Mary for two more years, (a total of approximately twelve years), until early 1970, when Mary went to live at the hospital with her husband who was dying of lung cancer. Matt spent approximately four months at a nursing home and thereafter lived with another sister, Iva Lewis Murray, one of the Defendants below who disclaimed any interest in the property. Matt lived with Iva for almost thirteen years until his death on February 26, 1983, nine days after his 82nd birthday.
More about Matt, whose competence to convey is central today. Matt was born to G.W. and Mary Jane Lewis on February 17, 1901. He was the eldest of eight children. Matt was either born with, or, at a young age, was stricken with Hydrocephaly, or Hydrocephalus, a condition characterized by an enlarged cranium. No expert testimony was offered at trial as to the effects of Hydrocephaly generally, or on Matt specifically. Three statements by two doctors, contained in hospital records, were placed in the record by agreement. The first one, dated June 7, 1970, states, in pertinent part, "SOCIAL HISTORY: Elderly white male, reasonably intelligent, Hydrocephalic," and is signed by J. Breeland, M.D. On April 7, 1971, Matt was again admitted to the hospital and the doctor's report states, "SOCIAL HISTORY: Elderly white male somewhat retarded ... IMPRESSION: Hydrocephaly and arthritis." This report is also signed by J. Breeland, M.D. On admittance in 1972, J.B. Becker, M.D., reports, "REVIEW OF SYSTEMS: HEENT  Poor vision, quite an enlarged cranium. Normal speech and apparent good mental ability."
A.Dee, Sarah, and Sarah's daughter, Georgia Maxine Dunigan (Georgia), were of the opinion that Dr. Breeland was right in 1971. Georgia, who was the only witness called by A.Dee and Sarah, testified that Matt did not initiate conversations and did not join in or comprehend normal conversations, did not have the mental capacity to understand the meaning or value of money, only answered questions directed to him, and showed no interest in or concern for other family members. She said Matt could not read or write, did not have any religious views, did not laugh, but cried from pain and cried when he did not have pain. A.Dee testified that Matt did not have "mind enough" to execute a deed, did not "know he had an acre of land, let alone a hundred" and would simply answer questions with "`uh-uh' and `un-huh'". Sarah testified that Matt was deformed and mentally incompetent and could not read or write.
Adding more flesh to the story, everyone agreed that Matt was severely physically handicapped. Throughout his life he was dependent upon others for his care. Matt never had a job, but when he was younger he could draw water from the well and chop wood. He was partially paralyzed and had difficulty moving around and caring for himself. These physical handicaps became progressively worse as he grew older. By 1967 Matt was confined to a wheelchair and not many years later he was confined to his bed.
Jerry Lewis (Jerry), one of Matt's nephews, testified that it was his understanding that Matt had suffered infantile paralysis as a young child and that this had caused his physical disabilities. Jerry was also aware that Matt had an enlarged cranium but was of the opinion that this did not affect his mental abilities. Jerry is the son of Matt's brother, E.H. (Holmes) Lewis, who died in 1947. After his death, Jerry and his brother, Holmes Ronald, two sisters, LaMarian and Karen, and their mother, Ezelee Allred Lewis, spent essentially every night at G.W. and Mary Jane's home *1188 with G.W., Mary Jane and Matt. The children knew Matt then and continued to visit him throughout his life. Jerry, Karen and LaMarian each testified that throughout Matt's life they had normal conversations with him and that his intelligence was normal. Jerry had seen his uncle with books and magazines but did not remember seeing him reading. When asked if he could remember any time when Matt displayed concern for family members, Jerry recounted that Matt had shown him the place where his mother, Mary Jane, had just suffered a stroke. Jerry acknowledged that he had never heard Matt inquire about the value of his property or ask for anything except afternoon coffee. Still, it was Jerry's opinion that Matt comprehended the fact that he had wealth in property.
LaMarian testified that Matt wrote words and numbers for her when she was a little girl, and that they discussed the people who visited him and how she was doing in her basketball games. They did not discuss his property, but in her opinion Matt was aware of the fact that he owned the land and minerals he had been given. Karen testified that she had never seen him crying or acting mean and contrary, but that he would "get angry occasionally or mad, but who doesn't? We all do." Seven neighbors and friends and a Southern Baptist minister testified that throughout his life Matt had normal conversations with them and was mentally competent.

B.
In their complaint, filed in the Chancery Court of Franklin County on January 9, 1984, A.Dee and Sarah alleged that two deeds, dated April 30, 1946, and February 14, 1950, each purporting to convey twenty acres of Matt's land to Mary, were forgeries and the product of Mary's undue influence over Matt. As to the last sixty acres of Matt's land, A.Dee and Sarah charged that Mary deeded it to herself as Matt's guardian on May 16, 1966, and that on March 29, 1967, while still acting as his guardian, she had the same land conveyed to her by a deed purporting to be signed by Matt with an "X". A.Dee and Sarah further alleged that Matt was born with a physical and mental condition called Hydrocephalus, that he was born deformed, that he could not read or write, and that his mind, throughout his lifetime, was below that of a twelve-year-old child. They prayed that all four deeds be cancelled and that they be awarded punitive damages because of Mary's "diabolical act against her own crippled and deformed brother."
Mary answered with specific denials of any impropriety on her part or mental incapacity on Matt's part and raised affirmative defenses of adverse possession, laches, equitable and judicial estoppel. The other named defendants, save one sister, Julia Lewis Flowers, answered and disclaimed any interest in the property covered by the deeds. Mary's children, James Wade Ratcliff (James) (and his wife, Lynda V. Ratcliff) and Donis Ratcliff Zumbro (Donis) were allowed to intervene, as they had each built homes on two acres of property deeded to them by their mother, Mary, out of the property deeded to her by Matt. The central characters, therefore, are A.Dee and Sarah, on the one hand, and Mary and her children, on the other. Their deceased brother, Matt, is squarely in the middle.
The case went to trial on September 26, 1985. In the end, the Chancery Court held that:
(1) Matt's signatures on the three deeds were genuine and not forgeries;
(2) Matt had the mental capacity to execute the three deeds; and
(3) That, as to the third deed of March 29, 1967, a fiduciary relationship, growing out of the guardianship, existed between Mary and Matt and there arose a presumption of undue influence which Mary successfully rebutted.
(4) Even if incorrect on the above rulings, A.Dee and Sarah are barred by judicial estoppel, laches, equitable estoppel and adverse possession.
On this appeal, A.Dee and Sarah challenge everything except the Chancery Court's determination on the issue of forgery.

*1189 III.

Scope of Review
Our standard of review is well known. This Court will not reverse a Chancery Court's findings of fact where they are supported by substantial credible evidence in the record. Anderson v. Burt, 507 So.2d 32, 36 (Miss. 1987); Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Gilchrist Machinery Co., Inc. v. Ross, 493 So.2d 1288, 1292 (Miss. 1986); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983); Culbreath v. Johnson, 427 So.2d 705, 707-09 (Miss. 1983); Richardson v. Riley, 355 So.2d 667, 668 (Miss. 1978). This is as true of ultimate facts as of evidentiary facts. Norris, 498 So.2d at 814; Gilchrist, 493 So.2d at 1292; Spain v. Holland, 483 So.2d 318, 320 (Miss. 1986); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985); Cheek v. Ricker, 431 So.2d 1139, 1143 (Miss. 1983).
Put another way, this Court ought and generally will affirm a trial court sitting without a jury on a question of fact unless, based on substantial evidence, the court be manifestly wrong. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc. (Miss. No. 56,389, dec. Aug. 26, 1987) (not yet reported); Brown v. Williams, et al., 504 So.2d 1188, 1192 (Miss. 1987); Harkins v. Fletcher, 499 So.2d 773, 775 (Miss. 1986); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986); Will of Polk, 497 So.2d 815, 818 (Miss. 1986). This Court must examine the entire record and accept
that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact ...
Cotton, 435 So.2d at 685.
And, finally, the trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses. Hall v. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963). This Court must examine assignments of error presented in light of the aforementioned principles.
There is a nuance that ought be mentioned, as several issues before us import a clear and convincing proof burden. In determining whether there is in the record sufficient credible evidence that the trial court's findings should be affirmed, we bear in mind the quantum of proof the party burdened at trial was required to produce in order to prevail. Here on several issues  A.Dee and Sarah's challenge to Matt's mental capacity to make a deed and Mary's burden to prove that the 1967 deed was not procured by undue influence  that party was saddled with a clear and convincing evidence burden. Where the appealing party has such a burden at trial, he necessarily has a higher hill to climb on appeal, as we look at all of the evidence and decide whether a rational trier of fact may have found undue influence, etc., by clear and convincing evidence. Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2512-13, 91 L.Ed.2d 202 (1986); United States v. Taylor, 464 F.2d 240, 242 (2d Cir.1972). Put otherwise, the minimum evidentiary offering from the unburdened appellee necessary for affirmance is less than it would be if the preponderance of the evidence rule applied. And the converse is so where at trial the party appellee here bore a clear and convincing evidence burden.

IV.

Was The Chancellor's Finding That Matt Lewis Was Mentally Competent To Execute The Deeds In Question Manifestly Erroneous and Against The Overwhelming Weight Of The Evidence?
The Chancery Court found that A.Dee and Sarah had failed to prove by clear and convincing evidence that Matt lacked mental capacity to execute the 1946, 1950, and 1967 deeds. In so deciding, the Chancery Court relied on evidence that:
(1) in 1942 Matt's parents conveyed to Matt one hundred acres of land and their home, without reservation or restriction, "clearly indicating their confidence in [Matt] and his ability to handle his own affairs at that time";

*1190 (2) the Plaintiffs joined in the 1959 guardianship petition, wherein they represented that Matt was mentally competent (though physically disabled);
(3) the Chancery Court, based on the sworn representations in the 1959 petition, found that Matt was mentally competent; and,
(4) the physicians' statements contained in the hospital records, which while contradictory to a limited extent, indicate that Matt was of normal intelligence.
Most persuasive to the Court was the testimony of friends, neighbors and a minister who had known Matt over many years, indicating that Matt was physically incapacitated, but had normal intelligence, was mentally competent and capable of executing the deeds.
One seeking to set aside a facially valid and recorded deed bears the burden of proof. Where the challenger asserts lack of mental capacity to execute a deed, his burden becomes one of proving his point by clear and convincing evidence. Richardson v. Langley, 426 So.2d 780, 783 (Miss. 1983); Gillis v. Smith, 114 Miss. 665, 676-77, 75 So. 451, 453 (1917). A facially valid deed is rebuttably presumed to have been executed by a person with the requisite mental capacity. Richardson, 426 So.2d at 786. The grantor's mental capacity is to be measured as of the time of the execution of the deed, Richardson, 426 So.2d at 783; Moore v. Stone, 208 So.2d 585, 586 (Miss. 1968), although the challenging party may carry his burden by showing that the grantor was permanently insane up to and beyond that moment in time.
Weakness of intellect, as distinguished from lack of capacity, when coupled with another factor, such as grossly inadequate consideration, or the existence of a confidential relationship may merit judicious judicial scrutiny. Richardson, 426 So.2d at 783; Cunningham v. Lockett, 216 Miss. 879, 63 So.2d 401, 404 (1953); Gillis, 114 Miss. at 685-86, 75 So. at 456. On the other hand, inter vivos deeds of gift are a perfectly respectable mode of conveyance. See Ross v. Brasell, 511 So.2d 492, 496 (Miss. 1987); Anderson v. Burt, 507 So.2d 32, 36 (Miss. 1987), a categorical imperative eminent upon that sovereignty our law confers upon an individual over that which he owns. A right in property implies a legal power to convey that right as the holder desires. The legal standards stated, our critical question becomes whether there was adequate evidence to render immune from appellate disturbance the finding that Matt was mentally competent on April 30, 1946, February 14, 1950, and March 29, 1967.
No witness gave firsthand knowledge of Matt's early years, but several testified they had been told Matt did not start school until he was twelve, stayed in school for nine years, and only completed the fourth or fifth grade. Undisputed testimony showed that Matt never held a wage-earning job and never asked for any personal possessions. A.Dee, Sarah and Georgia testified that Matt could not read, while Jerry, LaMarian and Karen testified that they did not know whether Matt could read. A.Dee, Sarah and Georgia gave their opinions that throughout his life Matt was mentally incompetent.
Among the testimony of Jerry, LaMarian and Karen and ten friends and neighbors, opinion evidence was offered to the effect that throughout his life and during the time period when each deed was executed Matt was mentally competent. A.Dee and Sarah argue that none of the witnesses' testimony regarding Matt's normal conversations establishes Matt's ability to understand the nature and value of his property, because they did not discuss business matters with Matt.
No one who testified was present at the execution of the 1946 deed. However, a copy of the 1946 deed, duly acknowledged and executed, was admitted into evidence. A.Dee opined that, as to the 1946 deed, her mother did not approve it and her father was probably talked into approving it. Georgia testified that the 1950 deed was executed on Matt's parents' (G.W. and Mary Jane) and Matt's porch and that there was a crowd of people around but she does not know whether the notary public was *1191 there. Georgia also testified that G.W. and Mary Jane knew about the deed. Once again, a copy of the 1950 deed, duly executed and acknowledged, was admitted into evidence.
Evidence of Matt's state of mind regarding the 1967 deed came from Elaine Arnold, a neighbor of Matt's from 1964 until June 1965. Arnold testified that in the spring of 1965 Matt told her, while no one else was present, that he intended to give Mary and her husband, Lenoir, all of his property because they had taken care of him. Matt also told her how many acres of land were involved, but Elaine did not remember the amount he stated.
Georgia testified that she was present the day the 1967 deed was executed and that Matt "sit looking straight ahead that morning just like he was in a trance. He did not say one word the entire time." This, she states, took place at Mary's house. Milton Jordan, before whom the 1967 deed was acknowledged, testified that Matt, Mary and two witnesses to the deed drove out to his place of business and that he notarized the deed. He further testified that he and Matt had general conversation about the business at hand and that Matt seemed competent in his discussion concerning the deed.
Finally, Ebbie Patt, a neighbor, testified that roughly six months before Matt died, sometime in 1982, he and Matt and Matt's sister, Iva, were talking and Iva asked Matt "`Didn't you have some land in Franklin County?'" and that Matt answered "Yeah. I gave it to Mary because she took care of me. I sure did." The 1967 deed was also received into evidence.
The above evidence, coupled with the facts that the Court cited, convince us that on this record, given the challengers' burden of proof, a rational trier of fact could find that Matt was in fact mentally competent at the time he executed the April 30, 1946, February 14, 1950, and March 29, 1967, deeds.
The assignment of error is denied.

V.

Was The Chancellor's Finding That There Was No Undue Influence Exercised By Mary Lewis Ratcliff Over Matt Lewis, With Relation To The Execution Of The 1946 and 1950 Deeds, Manifestly Erroneous And Against The Overwhelming Weight Of The Evidence?
The Chancery Court found a fiduciary relationship, and, hence, a presumption of undue influence only in relation to the March 29, 1967, deed. Implicitly, the Court found no fiduciary relationship and no undue influence surrounding the 1946 and 1950 deeds. This Court proceeds on the assumption that the Chancery Court resolved the unmentioned issues consistent with the final judgment. Ross v. Brasell, 511 So.2d 492, 495 (Miss. 1987); Anderson v. Burt, 507 So.2d 32, 38 (Miss. 1987); see also Day v. Day, 501 So.2d 353, 356 (Miss. 1987); Spain v. Holland, 483 So.2d 318, 320 (Miss. 1986); Kelly v. Shoemake, 460 So.2d 811, 817 (Miss. 1984).
A.Dee and Sarah argue that at the time of the 1946 and 1950 deeds Matt was in such a state of dependence upon Mary that she owed him duties like those of a fiduciary. They cite and quote Hendricks v. James, 421 So.2d 1031 (Miss. 1982):
Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.
Hendricks, 421 So.2d at 1041.
A confidential relationship such as would impose the duties of a fiduciary does not have to be a legal one, but may be moral, domestic or personal. Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984); Hendricks v. James, 421 So.2d 1031 (Miss. 1982); Bourn v. Bourn, 163 Miss. 71, 140 So. 518 (1932). The relationship arises when a dominant, overmastering influence *1192 controls over a dependent person or trust justifiably reposed. Hendricks, 421 So.2d at 1041; McDowell v. Pennington, 394 So.2d 323 (Miss. 1981); Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959). Such a relationship must be shown before we will scrutinize one's right to give away his property, for an inter vivos gift is a perfectly lawful means of transferring real property in this state. Anderson v. Burt, 507 So.2d at 36; Matter of Collier, 381 So.2d 1338, 1341 (Miss. 1980); Longtin v. Witcher, 352 So.2d 808, 810-11 (Miss. 1977).
The burden of establishing the existence of a fiduciary relationship is upon the party asserting it. Norris v. Norris, 498 So.2d 809, 813 (Miss. 1986); Harris v. Sellers, 446 So.2d 1012, 1014 (Miss. 1984). Because of the severity of the burdens and penalties of the confidential relationship, the party claiming the benefits of the existence of such a relationship must establish clearly his entitlement. Norris, 498 So.2d at 814; see also Gillis v. Smith, 114 Miss. 665, 676, 75 So. 451, 453 (1917) (clear and convincing evidence necessary to show conveyance procured by undue influence).
A.Dee and Sarah swim upstream against our scope of review. Supporting the Chancery Court's implicit findings of fact are: (1) one of Matt's parents was with Matt at all times until their deaths in 1956 and 1958; (2) Matt relied wholly on his parents for advice and counsel; (3) many of G.W. and Mary Jane's children lived within close proximity of the old home place and Mary had no closer relationship with Matt than any of his other brothers and sisters; and (4) both deeds from Matt to Mary were made with G.W. and Mary Jane's knowledge and consent.
The Chancery Court's refusal to find that Matt's relationship to Mary was such that Mary owed him fiduciary duties, and, as well, that Mary exercised undue influence over Matt during the time period in which the 1946 and 1950 deeds were executed, was well within its authority.
The assignment of error is denied.

VI.

Was The Chancellor's Finding That The Appellees Had Overcome The Presumption Of Undue Influence In The Execution Of The March 29, 1967, Deed Manifestly Erroneous and Against The Overwhelming Weight Of The Evidence?

A. Murray v. Laird Revisited

The Chancery Court found in the case of the March 29, 1967, deed, that a confidential relationship did exist and that a presumption of undue influence arose as to the execution of the March 29, 1967, deed. The major factual circumstance generating this finding was Mary's service as guardian of Matt's estate from February 5, 1959, until May 6, 1968. In this the Court was correct. A legal relationship such as that found here may often undergird a finding of ultimate fact that a confidential relationship exists. See Costello v. Hall, 506 So.2d 293, 296-97 (Miss. 1987).
The Court further found that Mary had successfully rebutted the presumption of undue influence. The Court relied on the testimony of Elaine Arnold and Ebbie Patt, Jr. Arnold testified that in the spring of 1965 Matt had declared to her, in private, his intention to give his land to Mary and her husband. Patt testified that in 1982 Matt told him, in the presence of Matt's sister, Iva, that he had given his land to Mary because she had taken care of him. The Chancery Court stated:
There appear to be no hard and fast rules to say what evidence is sufficient to rebut a presumption of undue influence. It is persuasive to this court, however, that the grantor disclosed his intention to a disinterested person prior to executing the deed and subsequently acknowledged to another disinterested person some fifteen years later that he had made such a deed.
We can understand how the Court reached its conclusion that "there appear to be no hard and fast rules." In the recent case of Murray v. Laird, 446 So.2d 575 (Miss. 1984), this Court described a three prong test:

*1193 When the circumstances give rise to a presumption of undue influence, the burden of going forward with the proof shifts to the grantee/beneficiary to prove by clear and convincing evidence:
(1) good faith on the part of the grantee/beneficiary;
(2) grantor's full knowledge and deliberation of his actions and their consequences; and
(3) advice of (a) a competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interest.
Murray, 446 So.2d at 578. Other cases have stated the test more loosely, particularly the third prong.
The independent advice prong of Murray has been read too strictly. Considering the heavy burden placed upon one seeking to overcome the presumption of undue influence, we find it necessary to redefine the third prong of the Murray test. This we do to the end that the power our law vests in property owners to make bona fide inter vivos gifts not be practically thwarted by often impossible evidentiary encumbrances. We declare that the appropriate third prong of the test is a requirement that the grantee/beneficiary prove by clear and convincing evidence that the grantor/testator exhibited independent consent and action.
A quick summary of this state's law relative to the proof necessary to rebut a presumption of undue influence will show that the reading Murray has been given overstates the rule requiring independent consent and action by turning it into a seemingly uncompromising requirement of independent advice. Independent advice is but one way independent consent and action may be shown. Therefore, the factors listed in Murray, in the discussion of the independent adviser's role, 446 So.2d at 579, should be treated as factors that may be considered where independent consent and action is proven by independent advice.
The history makes clear the point. In the seminal case of Meek v. Perry, 36 Miss. 190 (1858), this Court held that to rebut successfully a presumption of the invalidity of a will or deed, procured by a guardian from a ward, the grantee/beneficiary must demonstrate the fullest deliberation on the part of the grantor and abundant good faith on the part of the grantee/beneficiary. Meek v. Perry, 36 Miss. at 258-59. Almost seventy years later, in Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926), this Court adopted the language of 2 Pomeroy Equity Jurisprudence (4th ed.) § 957, which states that a presumption of the invalidity of a transaction between parties to a fiduciary or confidential relationship can be overcome by clear and convincing evidence of good faith, of full knowledge, and of independent consent and action. The Ham Court went on to hold that the evidence failed to establish that the grantor had full knowledge of the value of the property conveyed, of the relation of the consideration therefor thereto, and that it was executed of his own independent consent and action. Ham, 110 So. at 585. It is important to note that the Ham opinion uses the "independent consent and action" language. In the next sentence the Court adds:
The usual method of proving independent consent and action in such cases, and probably the only way it can be clearly proven, is by showing that in making the deed the grantor acted on the advice of a competent person disconnected from the grantee and devoted wholly to the grantor's interest. [citations omitted]
Ham, 110 So. at 585.
While this is indeed a strong suggestion, this Court has not demanded routinely, a showing of "independent advice" in the cases that have followed. Since Ham, some cases have required a showing of "independent advice". See Watkins v. Martin, 167 Miss. 343, 147 So. 652, 654 (1933); Wofford v. Wofford, 244 Miss. 442, 459-61, 142 So.2d 188 (1962); In re Will of Moses, 227 So.2d 829 (Miss. 1969); Jones v. Singley, 242 So.2d 430, 435 (Miss. 1970); Hendricks v. James, 421 So.2d 1031, 1043-45 (Miss. 1982). Other cases have cited only the Ham rule that evidence of good faith, of full knowledge and of independent consent and action are necessary, omitting any *1194 reference to the Ham "independent advice" language. See McElveen v. McElveen, 233 Miss. 672, 677, 103 So.2d 439, 442 (Miss. 1958); Thomas v. Jolly, 251 Miss. 448, 454, 170 So.2d 16, 20 (Miss. 1964); Jones v. Jones, 246 So.2d 486, 487 (Miss. 1971); Mansell v. Gross, 345 So.2d 1315, 1317 (Miss. 1977).
In Croft v. Alder, 237 Miss. 713, 725, 726, 115 So.2d 683, 688-89, 691 (Miss. 1959), this Court, cited both relevant portions of Ham, then held that the presumption could be overcome only by clear evidence of good faith, full knowledge and independent consent and action, and that there was not clear and convincing evidence that the grantor had acted with a deliberate and independent purpose of his own. In Manning v. Hammond, 234 Miss. 299, 304, 106 So.2d 51, 54-55 (Miss. 1958) and Leggett v. Graham, 218 So.2d 892, 895 (Miss. 1969) this Court, without citing Ham, stated that the presumption of undue influence could be rebutted with evidence of independent action. Most recent cases have followed Murray. See Harris v. Sellers, 446 So.2d 1012 (Miss. 1984); Kelly v. Shoemake, 460 So.2d 811 (Miss. 1984); Matter of Launius, 507 So.2d 27 (Miss. 1987). Since Murray, however, this Court has had occasion to state the three part test simply as that requiring good faith, full knowledge, and independent consent and action. See Estate of Lawler v. Weston, 451 So.2d 739, 743 (Miss. 1984).
As stated above, we declare that "independent consent and action" is the appropriate third prong of the test. We are led to this view by our historical review of this state's common law and, as well, by common sense. The three prongs of Murray, as hereby modified, are quite useful in determining whether a grantee such as Mary has proven the negative: the absence of undue influence. These prongs should not be understood as entirely separate and independent requirements that ought be rigidly exacted in every case. Undue influence is a practical, non-technical conception, a common sense notion of human behavior. As helpful as Murray may be to identify factors that ought be considered, common sense counsels against rigid, inflexible multi-part tests, particularly as the parties our law saddles with proof of the negatives are laymen, not legal technicians. Better that the scope of equitable principles be imperfectly defined than that justice be overborne by the weight of artificial rules.[1]
Murray recognizes these premises. We note four statements made by the Court in Murray v. Laird.
Counsel asks for guidelines from this Court; however, this Court cannot set forth guides that fit all situations. Of necessity, each case must be determined individually on its merits.
* * * * * *
However, from case decisions some affirmative and positive factors emerge that may be considered as significant to overcome the inference of the presumption.
* * * * * *
The Court recognizes that prior disclosure of a donation is not a prerequisite to its validity; but the disclosure of intent made prior to execution of an instrument helps dilute the undue influence presumption.
* * * * * *
Even after all testimony relating to these named factors is received, it is still to the trier of fact to judge the credibility of the witnesses and the worth of their testimony.
Murray, 446 So.2d at 578-79.
Applying the slightly modified Murray test, this Court must now determine whether the Chancery Court's finding that Mary had successfully rebutted the presumption of undue influence was manifestly erroneous and against the overwhelming weight of the evidence. See Part III above.

*1195 B. Good Faith

Murray suggests five factors that ought be considered in determining whether the grantee/beneficiary has acted in good faith. These are, (a) determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy and openness given the execution of an instrument.
In the instant case, the facts suggesting that Matt was "the initiating party in seeking preparation of the [deed]", come from the testimony of Elaine Arnold and Ebbie Patt. Their testimony indicates that Matt fully intended for Mary to receive his property in repayment for the years of care she had given to him. The testimony does not establish who in fact had the deed prepared although presumably it was Mary, as Matt was living with her at the time and totally physically dependent on her and her husband, Lenoir.
The second factor is "the place of the execution of the instrument and in whose presence." Georgia testified that the 1967 deed was executed in Mary's house in front of two witnesses and Mary and Georgia. Milton Jordan testified that the two witnesses, Mary and Matt drove to his place of business where the deed was acknowledged, executed, and notarized.
Factors (c) and (d) concern consideration paid for the deed. Mary paid Matt no monetary consideration for the 1967 deed. However, Matt had been living with Mary and her husband, Lenoir, for nine years prior to the execution of the 1967 deed. In Moore v. Stone, 208 So.2d 585, 586 (Miss. 1968), this Court found the aid and assistance given to the mother and father during the period of time from 1951 until 1957 adequate consideration for conveyance of twenty acres of land.
The last factor is the secrecy. Here, everyone in the family was aware of the execution of the 1967 deed immediately or shortly thereafter.

C. Full Knowledge

Murray suggests four factors to consider in determining the grantor's knowledge, at the time of execution of the instrument. These factors are, (a) his awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor on him and how susceptible to his influence.
Matt's nephew, Jerry, and two nieces, LaMarian and Karen, testified that in their opinion Matt was aware of his assets and their general value. Georgia, A.Dee, and Sarah of course testified to the contrary, that Matt was mentally incompetent and unaware of, either the value of money, or his property. We find in the record no testimony in relation to Matt's understanding of the persons who would be his natural inheritors. Factor (c) is inapplicable in this case as there are no non-relative beneficiaries involved. There is little in the record to indicate, one way or the other, whether Matt knew who controlled his finances other than the general and hotly disputed testimony regarding his mental competence and the fact that Matt petitioned the Chancery Court in 1959 requesting that Mary be appointed guardian of part of his estate (the oil and gas lease assets).

D. Independent Consent and Action

Elaine Arnold's testimony that, two years prior to the execution of the 1967 deed, Matt expressed his intent to convey his land to Mary and Lenoir in repayment for their taking care of him, and Milton Jordan's testimony that on the date of the execution of the deed Matt knew what he was doing are in today's posture entitled to substantial weight. They establish Matt's independent consent to convey the land to *1196 Mary and his independent act of conveyance. This proof of Matt's independent action is further bolstered by Ebbie Patt's testimony that, near the end of his life, Matt told Patt that he had given his land to Mary because she had taken care of him.
In the end, we return to our scope of review. Of this we said in Culbreath v. Johnson, 427 So.2d 705 (Miss. 1983):
The trial judge saw these witnesses testify. Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demeanor. He was there on the scene. He smelled the smoke of battle. He sensed the interpersonal dynamics between the lawyers and the witnesses and himself. These are indispensable.
Culbreath, 427 So.2d at 708.
In substance the Chancery Court held that Mary had proved by clear and convincing evidence that considering the totality of the circumstances, she had not procured the 1967 deed through the exercise of undue influence. We find the record to contain evidence of sufficient quality and quantity that a rational trier of the facts could have so concluded. The assignment of error is denied.

VII.

Did The Chancellor Commit Clear Error In Holding That The Deed of March 29, 1967, Was Valid, In That Said Deed Was Executed To The Guardian By The Ward?
Notwithstanding, A.Dee and Sarah argue that we should declare a bright line rule that a guardian may never acquire his ward's property during the existence of the guardianship without chancery court approval. Such a rule, of course, would affect only the 1967 sixty acre conveyance.[2]
The case law, Brockett v. Richardson, 61 Miss. 766 (1884), and V.A. Griffith's treatise on Chancery Practice, upon which A.Dee and Sarah rely, is inapplicable to the facts of this case. In Brockett, this Court held that a guardian has no right, as against his ward, to purchase the trust property, even in good faith. Griffith repeats this proposition in Mississippi Chancery Practice § 47 (2d ed. 1950). First, Mary's disability grows out of a guardianship established for the sole purpose of handling Matt's income acquired from an oil and gas lease. Matt's sixty acres were not, by virtue of the guardianship, under Mary's control. Second, Mary's disability is properly controlled by the law relative to undue influence, as discussed above in Section VI.[3]
The assignment of error is denied. In view of our disposition of the issues discussed above, there is no need to reach the further assignments of error.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] See generally, Kennedy, Form and Substance In Private Law Adjudication, 89 Harv.L.Rev. 1685 (1976).
[2] We regard the May 16, 1966, deed as wholly superseded by the March 29, 1967, deed. Nothing said here should be taken as conferring validity or effect upon the former deed.
[3] See also Costello v. Hall, 506 So.2d 293, 296-97 (Miss. 1987). In Costello we reversed a Chancery Court's finding of ultimate fact that a confidential relationship existed by virtue of the execution of a power of attorney and stated that a power of attorney given by one party to the other is but one factor suggesting such a relationship.