HAWKINS, Presiding Justice,
for the Court:
Eva Nell Green has appealed from a decree of the chancery court setting aside the will of Hollis F. Woodall, her father, in which she was the sole beneficiary, on the ground that the presumption of undue influence arising from the will’s execution had not been dissipated. Because there was ample evidence to support the chancellor’s conclusion, we affirm.
FACTS
Hollis Woodall (Woodall), a widower and lifelong resident of Pike County, died February 2, 1988, leaving five natural children and an adopted son, namely: Hughlon Woodall, Hollis Farrell Woodall, Mavis La-velle W. McMorris, Eva Nell W. Green, Yvonne W. Wilson (his children), and Kenn Allen Stockman. Stockman was also the natural son of Yvonne W. Wilson and grandson of Woodall.
Following the death of his wife intestate, Woodall and the children were tenants in common on approximately 74 acres of Pike County land inherited from the late Mrs. Woodall. The children executed a quitclaim deed to Woodall on June 29, 1978, with the understanding and agreement with him that he would will the property to them in equal shares. On July 5, 1978, Woodall executed a will in which he left all six children twelve acres each of the realty, and as to the two acres on which his residence was situated, he directed it be appraised and sold at the appraised value to whichever child was interested in purchasing it. The proceeds from the sale were then to be divided equally between the children.
Woodall lived alone on the property until October, 1984. At that time, following prostate trouble for which he was hospitalized, he also suffered a severe stroke from which he almost died. Thereafter he was disabled.
When he was discharged from the hospital in November, 1984, he was completely bedridden. Having determined that their *472 father needed full-time care, the children decided that he should move in with Eva Nell, a licensed practical nurse. The family further agreed that Eva Nell would receive a weekly allowance of $360 from Woodall’s funds in a joint account in the names of Woodall, Hughlon, and Farrell. Woodall’s monthly Social Security checks and retirement checks from the railroad, where he had worked for many years, also were used for his care.
Woodall improved both mentally and physically during early 1985. Eva Nell bathed him; dressed him, cooked for him, helped him with his daily walk, paid his bills and handled his other affairs. Toward the end of 1985, the other children became concerned that Woodall’s funds were getting low. Eva Nell asked her brother, Farrell, then living in Louisiana, if he would consider buying Woodall’s house and use the money for their father’s care. Hugh-lon and Lavelle talked to their father about selling the house to Farrell and he agreed to sell. According to Lavelle, Woodall stated: “As far as I am concerned, ya’ll can divide up the rest of the property equally.” After discussing the sale with the other family members, Farrell decided to buy the property in November or December of 1985.
In December the family held a meeting with Woodall at his home about the sale of his property to Farrell. All of Woodall’s children gathered and waited for their father and Eva Nell to arrive. When they arrived, Woodall yelled at everyone that he was not going to sell his property and accused everyone except Eva Nell of stealing from him. Farrell told everyone that he would not buy the house and everyone left. A few hours later, Eva Nell called Hughlon and told him that Woodall had changed his mind and would sell the property to Farrell. In January, 1986, Woodall executed a deed to his residence and ten acres to Farrell and his wife, Mozelle,[1] and the proceeds of the sale were used for his care and Eva Nell’s salary.
Soon thereafter, the other children learned that Eva Nell was not happy with Woodall’s 1978 will because it left a full child’s share to Stockman. Eva Nell had Richmond, a local attorney, draw up another will for Woodall which deleted Stock-man. Woodall balked at signing this will. According to Lavelle, Woodall came to her house crying, telling her that Eva Nell “talked to him worse than anybody ever talked to him in his life because he wouldn’t leave Kenn out of the will.”
Thereafter, Eva Nell’s relationship with her brothers and sisters worsened. They argued over how much money she should be paid. When the other children or other relatives visited Woodall, Eva Nell would most always remain in the room while they were visiting with him. Lavelle testified she heard Eva Nell tell Woodall that the other children did not care about him and only wanted his property.
On August 25, 1986, Woodall signed a document giving Eva Nell a general power of attorney. The attorney who prepared the power of attorney, Jerry L. Rushing, testified that Eva Nell called him and asked him to come see Woodall about a power of attorney. Rushing stated that when he went to Eva Nell’s house, Eva Nell told him that her father wanted to execute a power of attorney so that she could handle his business affairs. Rushing then talked to Woodall alone and explained to him what a power of attorney was and what Eva Nell would be able to do with it. Woodall said that he definitely wanted Eva Nell to have the power of attorney. Rushing prepared the power of attorney and Woodall executed it. None of the other children were told. When Lavelle learned of the power of attorney, she called Eva Nell, who would not talk about it, telling her that Woodall did not want to talk to her either.
The other children did learn that Eva Nell had secured a power of attorney over Woodall’s affairs, and filed a petition to have a conservator appointed for Woodall. This caused resentment and bitterness on *473 the part of Eva Nell and Woodall, and a suit was filed against the children by Woo-dall asking for actual and punitive damages. Gary Honea and Rushing shared office space, and Honea represented Woo-dall and Eva Nell in these proceedings.
On September 12, 1986, Woodall executed a new will which left his entire estate to Eva Nell and only love and affection to his other children. Rushing testified that a few days before the will was executed, Eva Nell called him and told him that Woodall wanted to discuss something with him. Later that day, Rushing stopped by Eva Nell’s house to talk to Woodall. Eva Nell told Rushing that her father wanted to execute a will. Rushing told Eva Nell that she and her son would have to leave the room before he would talk to Woodall about a will. Woodall then told Rushing that he wanted to execute a will and that he wanted to leave his entire estate to Eva Nell. Rushing then left the house and went back to his office to prepare a rough draft of the will.
A few days later, Rushing went back to Eva Nell’s house in order to talk to Woo-dall some more about the will. This time Woodall was the only person at the house. Rushing asked Woodall again how he wanted to leave his property in the will and Woodall stated that he wanted to leave his entire estate to Eva Nell. Rushing told Woodall that if he wanted to leave something to someone else, Rushing would keep the will in his safe deposit box and no one would know the contents of the will until Woodall’s death. Rushing then asked Woodall again to whom he wanted to leave his property in the will and he replied that he wanted to leave it all to Eva Nell.
On September 12, 1986, Eva Nell drove Woodall to Rushing’s office in order to execute the will. While Eva Nell waited in the waiting room, Rushing took Woodall to his secretary Betty Lambert’s office. Rushing and Woodall first discussed Woo-dall’s property. Woodall told Rushing what real estate he owned, where he got it, and how long he had owned it. Woodall also said he had some money in the bank although he did not know precisely how much. Rushing then set the will in front of Woodall and read the entire will to him, underlining with his finger each word as he read it. Because of very poor eyesight, Woodall could not read on his own. The prepared will left $10 and love and affection to each of his children except Eva Nell, who received the remainder of his estate. Rushing then asked Woodall if that was what he wanted. Woodall replied that he wanted to leave everything to Eva Nell and did not want to leave anything to his other children. Rushing then asked him if he would consider leaving the other children one dollar each and Woodall refused. Rushing then had Lambert redraft the will leaving only love and affection to the other children.
When the will was in final form, Woo-dall, Rushing and Lambert signed it and took it to Rushing’s safe deposit box. Woodall asked Rushing how much he owed him and told Eva Nell to pay him. Eva Nell wrote Rushing a check from Woodall’s account and she and her father left. The other children were not told by Eva Nell or their father about the execution of the second will.
At the conservatorship hearing on July 17, 1987, Woodall testified he had left Eva Nell the home and everything he had, except what he had sold to Farrell. He said he did this because he wanted to, and that Eva Nell had not influenced him to do so. Further he testified that Rushing had prepared the will as he told him to. He acknowledged that he had left the other children out of the will because that was what he wanted to do. On cross-examination, he could not recall the terms of the 1978 will. As for the change, he testified, “I’d just taken a notion and I wanted to change it so I went ahead and changed it.” At first he could not tell why he had done this, but then responded, “Cause hadn’t none of them done nothing for me. That’s why.” Again, he responded, “I done that because I wanted to do it.”
At the conclusion of the conservatorship hearing, the chancellor appointed a Mr. Barr conservator of Woodall’s estate, and *474 Eva Nell conservator of his person. This continued until Woodall’s death.
Upon Hughlon’s petition filed February 29, 1988, the chancery court admitted the July 5, 1978, will to probate and appointed Hughlon executor. Hughlon had proceeded to administer the estate and filed a petition for approval of his first and final accounting and discharge when Eva Nell on July 14 filed a petition to probate the September 12,1986, will, and thereafter to contest the 1978 will because it was revoked by the 1986 will.
The other children filed a devisavit vel non contest to the 1986 will on the issues of testamentary capacity and undue influence. The chancellor conducted hearings on February 16-17 and May 30-31, 1989. At the hearing the facts were developed as above related, and at the conclusion of the contestant’s case in chief, he directed a verdict for Eva Nell on the issue of testamentary capacity. Johnny Woodall and his wife Beatrice, brother and sister-in-law of Woodall, testified for Eva Nell. Pertinent excerpts of their testimony are as follows:
Direct Examination of Johnny Woodall:
Q. Is there any doubt in your mind when Mr. Woodall made this will and he talked to you about it, leaving it all to Eva Nell that that’s what he wanted to do?
A. He said that’s what he wanted.
Q. Whoever he left his property to, did you consider that to be his business?
A. Strictly his business. He knew all about what he was doing.
Vol. Ill, 444.
Cross-examination of Johnny Woodall:
Q. So if he were talking with Eva Nell, if Eva Nell was talking with him about what he should do with his property and who he should leave it to, then that might not be something that he would just talk with anybody about. Isn’t that right?
A. Well, I don’t know about that. I know he told me he had his business fixed like he wanted it.
[[Image here]]
Q. So all you’re saying is is that he told you that he had gotten his affairs the way he wanted it.
A. Wanted it, that’s right.
Q. But you don’t know why he wanted it that way, do you?
A. Well because Eva Nell was taking care of him.
[[Image here]]
Q. So you don’t know then what reasons she might have had to make out this will the way he did, do you?
A. Nothing only he said Eva Nell was the only one that had done anything for him.
Q. Okay. Do you know what period of time that he was talking about? Do you know for how long he’s talking about?
A. No. I don’t know.
[[Image here]]
Q. Is it possible that Mr. Woodall thought that he ought to leave everything to Eva Nell because she was taking care of him because he didn’t know about all of this money, all of his money that was being paid to her to take care him?
A. I don’t know. I just know he told me that they got everything he had.
[[Image here]]
Q. He didn’t give you any reason why he would leave them out of his will?
A. He did not tell me anything like that. All he told me is he had it like he wanted it.
Yol. Ill, pp. 446-51.
Direct Examination of Beatrice Woodall:
Q. All right. Let me ask you this, Miss Beatrice. Do you recall the occasion when Mr. Hollis talked to Mr. Johnny about having made this will and leaving everything to Eva Nell?
A. Yes, sir, I was right there in the room presence [sic].
[[Image here]]
Q. Okay, and what was it that Mr. Hollis said?
*475 A. He said, “I have got my will made like I want it and it’s going to stay that way, Johnny.”-
Yol. Ill, 456-57.
Neither Johnny nor Beatrice testified where the conversations with Woodall took place, however, nor when, nor whether Eva Nell was present or not.
At the conclusion of the hearings, the chancellor found in favor of the contestants on the issue of undue influence. He found that Eva Nell occupied a fiduciary relationship with Woodall, and that she had failed to dissipate the presumption. Citing Estate of McRae, 522 So.2d 731 (Miss.1988), Harris v. Sellers, 446 So.2d 1012 (Miss.1984), and Murray v. Laird, 446 So.2d 575 (Miss.1984), he found that the advice of Rushing was not meaningful independent advice. The chancellor held that, in view of his finding, there was no need to address the question of whether Woodall, because of the quitclaim deed, was contractually obligated to will all the children the property or their being entitled to specific performance. He set aside the 1988 will and Eva Nell has appealed.
LAW
From the above facts we can make certain conclusions.
In June, 1978, Mr. Woodall only owned an undivided one-sixth interest in this land. He acquired fee simple title to the entire tract because all the children executed a quitclaim deed to him. They were at the time a close knit family, and the children conveyed their interest to him in order that he would have free use of the land. They may well have intended that if Mr. Woodall should need to sell the land for his own sustenance, he would be free to do that as well. It was also clear, however, that all, including Mr. Woodall, agreed that he would execute a will devising the realty to them in equal shares, and this he did.
The chancellor did not address whether or not Mr. Woodall was legally obligated to will the property to them all in equal shares, including Stockman, nor do we. What is clear, however, is that this is not a case where the children never at any time had any title to the property of the parent. It certainly is a proper consideration that Mr. Woodall acquired title to the entire tract in the first place because of a deed from his children.
Mr. Woodall recognized his obligation to his children because he did in fact execute a will devising all the property to them in July, 1978.
This harmonious relation between Mr. Woodall and all his children continued through October, 1984 — over six years— when he suffered a stroke. He clearly loved all his children. They regularly visited him in his home.
There was peace and harmony between the children when all agreed Mr. Woodall should live with his daughter Eva Nell, a practical nurse, who would be compensated from Mr. Woodall’s income and funds for caring and tending to him. There is nothing in the record to indicate anything other than Mr. Woodall’s receiving proper care and attention from Eva Nell.
This record does not reveal one unkind or thoughtless act on the part of the children towards Mr. Woodall. Yet in less than two years following his living with Eva Nell, Mr. Woodall developed a strong distaste, if not dislike, of every child except Eva Nell. In September, 1986, he executed a will devising all his property to her, and did not even want to leave as much as a dollar to any other child. He and Eva Nell filed a lawsuit for actual and punitive damages against the other children.
Where did he get these ideas, this antipathy? During this entire period he was totally dependent on Eva Nell for his basic physical needs, including bathing.
What Eva Nell did or did not do to precipitate or encourage his wrath, only she knows. Her sister Lavelle heard her tell him that the other children did not care for him and only wanted his property. Yet in situations as this what actually occurs is for the most part cloaked in secrecy. Kelly v. Shoemake, 460 So.2d 811 (Miss.1984); Hendricks v. James, 421 So.2d 1031 (Miss.1982). It is nevertheless clear from this record that Eva Nell did absolutely nothing *476 to discourage totally unjustified and unwarranted ill-will which her father developed towards her brothers and sisters. She above all others was in the best position to tell Mr. Woodall he was mistaken or unfair in the thoughts he was developing about the other children.
She knew her father had at the very least a strong moral obligation to leave his property to all the children. Moreover, she had entered into the agreement the same as the others: that at her father’s death all would share equally in property which initially came to them all from their mother.
She attempted without success to get him to execute a will leaving the adopted son Stockman out of the estate. Mr. Woo-dall balked at that.
Shortly thereafter, however, she took control of all his financial affairs, and he went to a lawyer of her selection and executed a will leaving everything to her.
As shown by his testimony at the conser-vatorship hearing, Mr. Woodall was a man of some resolution. He made his intention clear at the time. Eva Nell had been unable in her previous attempt to get him to execute a will excluding Stockman. Yet, in a matter of months, for some reason he changed his mind and decided to exclude every child except Eva Nell. What Eva Nell did or did not do or say to her father, as above noted, only she knows. “We cannot in this case unravel the secrets behind the bond between parent and child.... [Yet] There is generally a subtle recognition by one family member of what tune to play to get another member of the family to dance.” Matter of Estate of Vick, 557 So.2d 760, 767 (Miss.1989); Jamison v. Jamison, 96 Miss. 288, 51 So. 130 (1910).
The chancellor in this case found, about which there is no dispute, that there was a confidential relationship in fact between Mr. Woodall and Eva Nell, in which she was the dominant party. He also found that she had not dissipated the presumption of undue influence arising from the execution of the will.
Our inquiry is whether under these facts he was manifestly wrong.
In Murray v. Laird, 446 So.2d 575 (Miss.1984), we stated that in order to overcome the presumption of undue influence, the proponent of the will or deed must present clear and convincing evidence of:
1. Good faith on the part of the grantee/beneficiary;
2. Grantor’s full knowledge and deliberation of his actions and their consequences; and
3. Advice of (a) competent person, (b) disconnected from grantee and (c) devoted wholly to the grantor/testator’s interest.[2]
Murray also lists several factors to be considered under the good faith prong of the test:
(1) Identity of the initiating party in seeking preparation of the instrument;
(2) Place of the instrument’s execution and identity of those present;
(3) Consideration and fee, if any;
(4) Identity of individual paying the fee;
(5) Secrecy or openness given the execution of the instrument.
Murray, 446 So.2d at 578.
Here, Eva Nell initiated the preparation of the will when she called Jerry Rushing and told him that Mr. Woodall wanted to discuss something with him. Rushing also testified that when he arrived at Eva Nell’s house to meet with Mr. Woodall, Eva Nell told him that Mr. Woodall wanted to execute a will. The will was executed in the law offices of Jerry Rushing. Mr. Woo-dall, Rushing, and Rushing’s secretary Betty Lambert signed the will in Lambert’s office while Eva Nell stayed in the waiting room the entire time. Testimony indicates that Eva Nell paid Rushing at the request of Mr. Woodall by writing a check from Mr. Woodall’s account. The execution of *477 the 1986 will was kept secret by Mr. Woo-dall and Eva Nell. As with the power of attorney, the other children were not told about the execution of the 1986 will. Previously, all matters concerning their father were discussed by all the children and all of them participated in making decisions which concerned his well-being and financial affairs.
In this case Eva Nell failed to meet the first requirement. The chancellor fully and fairly considered this matter, and we cannot say he was manifestly wrong.
Accordingly, we affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.

. This deed conveyed the house and two acres, which had been appraised at $50,000 to Farrell and his wife for $47,000. The other 8.65 acres adjoining the two acres were as his part of the inheritance.

. The third prong of the test in Murray was modified in Mullins v. Ratcliff, 515 So.2d 1183, 1193-94 (Miss.1987). The third prong now requires proof that the grantor-testator exhibited independent consent and action. See also Vega v. Estate of Mullen, 583 So.2d 1259, 1264 (Miss.1991).