609 So.2d 1225 (1992)
John Lee TAYLOR
v.
Kathryn Taylor WELCH, Martha Taylor Travis and Robert G. Nelson.
No. 89-CA-0666.
Supreme Court of Mississippi.
August 26, 1992.
Rehearing Denied December 3, 1992.
*1226 Clyde Ratcliff, McComb, for appellant.
H.B. Mayes McGehee, McGehee McGehee & Torrey, Meadville, Thomas F. Badon, Liberty, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and SULLIVAN, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Kathryn Taylor Welch, Martha Taylor Travis and Robert G. Nelson filed suit in the Chancery Court of Amite County, Mississippi, against John Lee Taylor, seeking the cancellation of certain deeds executed by James T. Taylor, father of John Lee Taylor, Welch and Travis, and grandfather of Robert G. Nelson, to John Lee Taylor and for the return of funds alleged to have been appropriated wrongly from his estate by John Lee Taylor. The lower court entered judgment for the complainants and John Lee Taylor has appealed to this Court. He assigns six errors committed by the lower court, however, we reform the contentions to present the following issues.
I. DID THE LOWER COURT ERR IN FINDING THAT THERE WAS A CONFIDENTIAL RELATIONSHIP EXISTING BETWEEN MR. TAYLOR AND HIS SON, JOHN LEE TAYLOR, ON AND PRIOR TO DECEMBER 23, 1980, AND, IF SO, WAS THE PRESUMPTION OF UNDUE INFLUENCE OVERCOME BY CLEAR AND CONVINCING EVIDENCE?
II. DID THE LOWER COURT ERR IN FINDING THAT THERE WAS A CONFIDENTIAL RELATIONSHIP EXISTING BETWEEN MR. TAYLOR AND JOHN LEE TAYLOR ON AND PRIOR TO JUNE 6, 1984, AND, IF SO, DID THE COURT ERR IN CONCLUDING THAT JOHN LEE TAYLOR AHD OVERCOME THE PRESUMPTION OF UNDUE INFLUENCE BY CLEAR AND CONVINCING EVIDENCE?
III. DID THE LOWER COURT ERR IN FINDING THAT THERE WAS NO DELIVERY OF CERTAIN DEEDS DATED JUNE 6, 1984, EXECUTED BY MR. TAYLOR?

*1227 FACTS
James Tate Taylor executed a will on December 29, 1971, which, in large part, serves as the basis for this suit. The will devised all of his property to his wife Cleo for life. The remainder, or the fee, if she predeceased him, was to be divided equally among four devisees: his son, John Lee, his two daughters, Katherine Evonne Welch and Martha Taylor Travis, and his grandson Robert G. Nelson. John Lee Taylor was to get a twenty acre home site where he already lived as part of his one-fourth. The will was duly executed and witnessed.
Mr. Taylor was born on June 20, 1894, and died on July 27, 1984. His first wife was Eunice Lee Robinson Taylor, who bore him three children. Kathryn Yvonne Taylor Welch was born on July 10, 1918. Martha Tate Taylor Travis was the next born, and John Lee Taylor was born on December 15, 1922. His first wife died in 1937 and he married Cleo Leggett Taylor in 1938. Their only child was stillborn.
During his lifetime, Mr. Taylor accumulated a considerable amount of property. His mother deeded him a life estate in 265 acres of land in 1934, with the remainder to his children. On this parcel of property, Mr. Taylor built his home. Later on, he acquired 678 more acres of land from his mother in fee simple. Apparently, Mr. Taylor was also a successful businessman in the Gillsburg community of Amite County, at times running a cotton gin and a sawmill.
Two of Mr. Taylor's children left the family farm when they grew up. Martha married and moved away from the farm, but returned when she and her husband divorced and when her only son, Robert G. Nelson, was about two years old. Coincidentally, this was about the same time when Mr. Taylor and his second wife had the stillborn child. As a consequence, Mr. Taylor and Cleo developed a very close relationship with this grandson. When Martha remarried and moved with her new husband to a farm about six miles away, her son (Bobby), began to live mainly with Mr. Taylor and Cleo. Martha's husband, Norman Reed Travis, owned a 150 acre farm near Mr. Taylor's. Martha testified that she had a good relationship with her father, but that he never gave her loans or bought things for her. Neither she nor her husband did things around her father's farm to help him. When Cleo died, Martha and Mr. Taylor had a disagreement about a ring that Cleo had owned, but Martha stated that they had parted on good terms.
Kathryn Yvonne Taylor Welch lived in Baton Rouge, Louisiana. She too thought her relationship with her father was good, in spite of the distance separating them. When Mr. Taylor was diagnosed with cancer in 1984, he began taking cobalt treatments in Baton Rouge. He was driven by one of the other family members and spent the weekdays with Kathryn and her husband, who would take him each day for the treatments.
John Lee Taylor, the appellant, was Mr. Taylor's only son. He lived on the family farm for almost his entire life, leaving only for a couple of years in college, about three years in the service during World War II, and about four months for a job in Baton Rouge. When he returned from the job in Baton Rouge, he began helping his father around the farm and finally began to farm his father's land on his own in 1949. He operated under at least two written leases on the 323 acres of his father's property, but never paid anything but nominal cash consideration. However, he stated that he always helped his father by doing chores around the farm and helping at the cotton gin and sawmill. John Lee built a house on his father's land in 1958, although Mr. Taylor did not give him a deed to the land until 1974. In addition to his farming operations, John Lee had a job at the Amite County Co-Op from 1959-1965 and at Production Credit Association from 1965-1985.
Robert Nelson (Bobby), as already mentioned, was Martha Tate Taylor Travis' son and the grandson who was practically reared by Mr. Taylor and Cleo. He called Mr. Taylor "Daddy" before he went off to college and after that began calling him "Papa." He and almost every other family member testified that he was like a son to *1228 Mr. Taylor and Cleo. Mr. Taylor paid practically all of Bobby's expenses at Mississippi College that were not covered by an athletic scholarship. Mr. Taylor's wife, Cleo, left all of her property to Bobby and his sister Betty. Bobby testified that Mr. Taylor was not upset by that fact, but was upset by Cleo's death to the extent of writing a song about it. In 1975, Mr. Taylor tried to give Bobby a deed to 90 acres of his land but Bobby would not accept it, telling Mr. Taylor that he could leave it to him when he died, if he wanted to. Although Bobby lived in various places other than the family farm after he graduated from college, he testified that he tried to visit and call as often as he could, particularly after Cleo died in 1974.
Shortly after Cleo's death, the events leading up to this lawsuit began to occur. Mr. Taylor had John Lee's name placed on his checking account at the Southwest Mississippi Bank on July 10, 1974. The signature card read "J.T. Taylor or John L. Taylor." John Lee testified that he did not know why his father wanted his name on the account and that his father just asked him to go by the bank and sign the signature card, which he did. John Lee testified that he never wrote a check on the account and that he did not even have any checks to write. Records from the same bank show that a safe deposit box was rented on October 4, 1974, for "J.T. Taylor or Bobby G. Nelson or John L. Taylor." John Lee testified again that he did not know about this arrangement when his father rented the box, but that his father later asked him to go by and sign the signature card, which he did.
Mr. Taylor opened a golden savings account at the Southwest Mississippi Bank on November 6, 1975, again in his own and John Lee's names. John Lee stated that he knew nothing of the account until his father asked him to go in and sign the signature card and that he did not know why his father put the account in his name also. Martha testified that she saw John Lee's name on one of the accounts and asked her father why the account was set up that way. His answer was that the account was in case he got sick or something. Mr. Taylor also opened a silver savings account in his and Bobby's names; John Lee testified that he did not know about that account until after his father died.
A number of financial transactions between Mr. Taylor and John Lee were shown in the years between 1980 and 1984. Most were characterized by John Lee as loans from Mr. Taylor to him and repayments of loans by him, and this could not be disproved at trial. Nor could it be proven that John Lee profited on these transactions, other than receiving interest free loans. Some of them were explained by John Lee as repayments from his father of bills he had paid.
In 1980, an oil company began negotiating with Mr. Taylor for a lease on his property. John Lee attended some meetings with his father concerning leasing the property. An offer was made to Mr. Taylor for a mineral lease on his land. However, since he only had a life estate on some of the land, the children's signatures were needed in order to lease all of the property. Two or three meetings were held between the members of the family. Mr. Taylor wanted everyone to sign the lease, which offered a one-eighth royalty and a $50 per acre bonus payment. John Lee also wanted everyone to sign the lease. However, Kathryn contacted an oil and gas lawyer in Jackson who advised her that the terms of the lease were not good for that area of the State. Martha agreed that the terms were not good enough and the two of them refused to sign the lease.
Subsequently, according to John Lee, his father instructed him to have a deed prepared transferring all of his mineral interests to John Lee. None of the other family members knew of this until much later. According to John Lee, he went to attorney Floyd Wayne Stratton's office, where he relayed his father's instructions to Stratton's associate, D. Reginald Jones. His father was not present. Jones prepared the mineral deed conveying all of Mr. Taylor's *1229 mineral interests to John Lee. According to John Lee, his father went by the law office alone when the deed was ready for signing. John Lee could not remember who paid the bill for the deed, which was signed on December 23, 1980.
Jones agreed that John Lee was the one who came in, requested the deed and furnished the description. To the best of his memory, John Lee was with his father when he came in to sign the deed. Jones unequivocally stated that he never had any conferences at all with Mr. Taylor or gave him any advice. All he did was read the deed and asked if it was what Mr. Taylor wanted. Jones could find no record of who had paid for the deed. He did think that Mr. Taylor was competent and knew what he was doing.
On February 26, 1981, John Lee and his wife executed a mineral lease in favor of Exxon on the mineral interest received from Mr. Taylor. The lease provided for a three-sixteenths royalty and $100 an acre bonus payment, or $37,450 for the 374.5 mineral acres Mr. Taylor had given his son. John Lee bought a certificate of deposit (CD) with this check, payable to himself or his father. John Lee could not explain why his father's name was on the CD except that he (John Lee) wanted it that way. According to John Lee, his father had wanted all of the bonus money when they were trying to get the whole family to agree, but he and his father had no understanding about who was to get the bonus money when he received the minerals. John Lee reported the bonus payment on his 1982 federal income tax return. The principal and interest of the original CD was continually reinvested except when, on August 23, 1982, only $32,072 was reinvested and $13,000 was deposited in John Lee's checking account.
Martha was the first of the other family members to learn about the mineral transfer and lease. She testified that she learned about mineral leases by working in the sheriff's office near the chancery clerk's office. When she found out, she went to John Lee and asked him what was going on and what would happen if he died, to which he replied that she must trust him. Kathryn stated that when she found out about the mineral deed, she asked her father about why he did it. His response to her was that they could not all get together then and that he did not think that they could get together now. Bobby stated that he did not ask his grandfather anything about the mineral deed because it was his to do with what he wanted to do.
As to Mr. Taylor's mental condition at the time of the mineral transfer, the evidence showed that, although he was eighty-six, he was still in good mental condition. John Lee and the attorney thought so. Thad Leggett, III, an attorney and county court judge, had been Mr. Taylor's lawyer for many years. In fact, Leggett drew the 1971 will disposing of the property at issue, if the cancellation of the deeds is upheld. He stated that, at the times he knew Mr. Taylor, no one could exert his will upon Mr. Taylor. He visited with Mr. Taylor often until about six months prior to his death in July of 1984. Bobby Nelson stated that, although his grandfather was a good businessman in his day, he thought that he could be influenced at times. Although he thought he was as close to Mr. Taylor as John Lee was, he never discussed his grandfather's business with him. He admitted that in 1980, Mr. Taylor was still active, driving, taking care of his own affairs and living alone on his farm. He also admitted that he was strong-willed up until the time of his death. Norman Travis, Martha's husband, thought that at the time Mr. Travis executed the mineral deed, he was competent to a degree, but no longer strong-willed.
None of the children or grandchildren ever challenged the mineral deed until after Mr. Taylor's death.
Mr. Taylor entered the hospital in January of 1984 and was diagnosed as having cancer of the throat. At that time he was eighty-nine (89) years old. He underwent the cobalt treatments already mentioned from January through March of that year. John Lee, his wife or Bobby Nelson drove Mr. Taylor back and forth to Baton Rouge for the treatments. The treatments considerably *1230 weakened Mr. Taylor, but he still remained fairly active, even driving his car around the community until about a month before his death in July.
According to John Lee, in late May or early June of 1984 his father asked him to have some deeds prepared for him. John Lee testified that, over two days, his father showed him what was to go to whom by outlining the property on some maps which he kept in his desk. John Lee testified that he made a map, indicating the property to be given to each individual shaded in different colors. At his father's request, John Lee attempted to see attorney Leggett to get the deeds drawn up, but Leggett was unavailable at the time. John Lee asked his father if he wanted to get someone else to do it and told him about Edwin Bean, an attorney who had been reared in Gillsburg and was practicing in McComb. Mr. Taylor told John Lee to have Bean prepare the deeds.
Bean testified that he had only been practicing law for about six months when John Lee came to see him about the deeds. He had known Mr. Taylor all of his life, as well as John Lee and Martha. He knew of Kathryn. He testified that John Lee called him at his office about the deeds, and he offered to stop by John Lee's house on his way home from work later that evening. He testified that, when he arrived there, John Lee had some descriptions typed out and some tax maps with lines drawn on them. However, he did not check the descriptions against the lines drawn on the maps.
Bean took the descriptions and had his secretary type up the deeds the following morning. He was concerned about Mr. Taylor's age and illness and discussed the correct execution of the deeds with his partner. He tried to call Mr. Taylor to come in and execute the deeds, but there was no answer at his house. He called John Lee's wife, Mary Francis, and asked her to bring Mr. Taylor in to sign the deeds after first visiting a doctor to have him examined for mental competency. He could hear Mr. Taylor in the background saying that he did not want to come to the phone. Later that morning, Dr. Gillies called Bean and gave him a positive report on Mr. Taylor's competency, which was later reduced to writing.
When Bean learned that Mr. Taylor was at his office, he went out into the reception area to greet him and also found John Lee and his wife present. He strongly suggested to Mr. Taylor that they go over the deeds alone, but Mr. Taylor insisted that John Lee be present to go over the descriptions with them to make sure that they were correct. Bean went over each deed with Mr. Taylor, who would sometimes check with John Lee on the descriptions. According to Bean, Mr. Taylor would describe a parcel as a particular forty acres or refer to it as running from one landmark to another.
Bean believed that Mr. Taylor knew what each parcel contained and who it would be going to and that Martha was not included because her share was going to her sons. Bean stated that Mr. Taylor even caught an error in one of the descriptions, which Bean then had his secretary correct. Bean asked Mr. Taylor whether he knew who his heirs were and whether he had a will, to which Mr. Taylor replied that he knew and that he had taken care of all that. Bean further stated that John Lee sat behind Mr. Taylor and did not say a word, "he just grinned."
Bean admitted that he did not figure the acreage contained in the descriptions, which did not recite an acreage, and that no one told him about the prior mineral conveyance. He stated that he told Mr. Taylor and John Lee that the deeds had to be delivered to be effective and that he later told John Lee the same in a telephone conversation. Bean was paid with a check filled out by John Lee and signed by Mr. Taylor.
There were four deeds executed by Mr. Taylor that day, June 6, 1984. The first was to John Lee. Although it did not recite an acreage, the description covered 370 acres out of the 658 then owned by Mr. Taylor. Another was to Kathryn and described 122 acres, although it did not recite the acreage either. Another was to Bobby, *1231 containing 146 acres, again, the number of acres was not recited in the deed. The final deed was to Ronald R. Travis, Martha's son, and described 20 acres, though not recited specifically.
None of the other relatives knew anything about these deeds. John Lee stated that Mr. Taylor carried the deeds out of the office. Two days later, on June 8, 1984, Mr. Taylor gave John Lee four envelopes and instructed him not to deliver them until after his death. He did not tell John Lee where to put the envelopes, but John Lee put them in the safe deposit box on that day. On June 11, Mr. Taylor told John Lee that he wanted the envelopes back, and John Lee retrieved the envelopes for his father. John Lee testified that he next saw the envelopes on July 5, when his father gave them to him again, this time with no instructions on what to do with them. He put them back in the safe deposit box the following day.
John Lee at some point spoke with Bean again and decided that he needed to deliver the deeds before his father died. Mr. Taylor's health by this time was quickly failing and he needed constant attention in his home. On July 11, 1984, John Lee retrieved the envelopes from the safe deposit box and began delivering them. When he gave Kathryn hers on that day, he told her that Mr. Taylor had told him not to deliver them until after his death but that he was delivering them now on legal advice. Three of the envelopes contained the deeds drawn by Bean, but Bobby's contained the deed to ninety acres which he had refused to accept in 1975.
On July 13, 1984, John Lee wrote a check on his father's checking account, which also was in his name, for $105,000 of the balance of $109,208.41. Asked who authorized this withdrawal, John Lee stated that he did and that his father knew nothing of it. He explained that he thought of the account as a gift to him from his father. On July 19, John Lee withdrew $4,000 from the same account. Mr. Taylor died on July 27, 1984, and John Lee then withdrew the remaining $523.82 from the account on August 6. John Lee filed for letters testamentary and a petition to probate his father's will on August 24, which were granted on September 7, 1984. On October 3, he withdrew the balance of $30,974.74 from the golden savings account bearing his father's and his names. The sums mentioned here were later paid into Mr. Taylor's estate and are not a part of this appeal.
The plaintiffs offered evidence of a land deal made between Mr. Taylor and Floyd and Hettye Huddleston. The Huddlestons were relatives and owned property adjacent to the Taylor property which once was part of a family tract. John Lee wished to acquire their property, but since he was involved with loans to the Huddlestons through the Production Credit Association, he could not directly engage in a sale with them. The PCA board of directors forced John Lee to give back an option to buy the property which he had obtained on July 28, 1983. On September 9, 1983, the Huddlestons sold the property to Mr. Taylor with an option to repurchase the property. On April 13, 1984, Mr. Taylor sold the land back to the Huddlestons. The Huddlestons at some time conveyed the property to Keith Starret who in turn conveyed it to John Lee on March 3, 1986, in consideration of John Lee's assumption of a $130,015 deed of trust.

DISCUSSION

I. and II.
The appellant contends that the lower court erred in finding that there was a confidential relationship existing between Mr. Taylor and John Lee Taylor, which raised a presumption of undue influence both as to (1) the mineral deed executed in favor of John Lee Taylor on December 23, 1980, (2) the four deeds of conveyance executed in favor of his children and grandchildren on June 6, 1984.
The legal principle with regard to confidential relationships and undue influence in connection with deeds and wills is well developed in this state. In order for a litigant to prove a confidential or fiduciary relationship from which undue influence arises, the relationship must reflect "a *1232 dominant, overmastering influence [which] controls over a dependent person or trust justifiably reposed." Mullins v. Ratcliff, 515 So.2d 1183, 1191-92 (Miss. 1987) (citing Hendricks v. James, 421 So.2d 1031 (Miss. 1982); McDowell v. Pennington, 394 So.2d 323 (Miss. 1981); Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959)).
All of the evidence in the case at bar overwhelming shows that Mr. Taylor was a strong willed person, dominant over his children and was a man who thought things out for himself, made his own decisions and backed them up with action. John Lee Taylor, his son and the appellant, lived on his father's place, worked there, earned his livelihood, in part, from the farmland and was subject to the will, control and domination of Mr. Taylor, his father. Mr. Taylor created the ideas, planned their fruition, and consummated them with his own efforts and by instructing and appointing John Lee to help in the menial parts of the plans. Even up to the point of his death, Mr. Taylor was the "boss" and knew and approved what he and John Lee did in connection with (1) conveyance of Mr. Taylor's interest in 658 acres of mineral rights to John Lee on December 23, 1980 and (2) execution of the four deeds in favor of John Lee, Kathryn, Bobby and Ronald R. Travis, Martha's son.
We are of the opinion that the chancellor was manifestly in error in holding that there was a confidential relationship existing between Mr. Taylor and John Lee Taylor, which raised a presumption of undue influence on the part of John Lee in the execution of the deed instruments. We are further of the opinion that the chancellor was manifestly wrong and erred in holding that the deed instruments were void because of the mental incompetency of Mr. Taylor and his lack of capacity to understand his actions in executing the deed instruments.
Therefore, the judgment of the lower court is reversed and judgment is rendered here in favor of the appellant on those issues.

III.
John Lee Taylor contends that the lower court erred in holding that there was no delivery of the deeds. The appellees contend that the lower court found John Lee to have waived the issue of delivery by failing to answer the amended complaint alleging no delivery and do not discuss the merits of the issue now before the Court.
The lower court's ruling at trial led John Lee to believe that he would be allowed to prove a valid delivery. The appellees objected to the evidence offered concerning delivery and the court ruled in favor of the appellant as follows: "All right. Well gentlemen, as I understand the objection at this point is that there was no answer filed to the amended complaint. I'll overrule the objection. Proceed." Rule 15(b) of the Mississippi Rules of Civil Procedure permits amendment of the pleadings to conform to the evidence, but also states that "[f]ailure to so amend does not affect the result of the trial of these issues." The lower court's ruling and the subsequent mass of evidence produced on the question in the issue presented bring it to this Court for decision.
The primary question in determining whether a valid delivery of a deed took place is the intention of the grantor. McMillan v. Gibson, 222 Miss. 408, 76 So.2d 239 (1955). Delivery must be complete and unequivocal in order to vest title in the purported grantee. Salmon v. Thompson, 391 So.2d 984, 986 (Miss. 1980).
In the case at bar, the deeds were delivered to John Lee for final delivery to the grantees. The delivery was a valid, effective delivery and was sufficient to convey title. Barner v. Lehr, 190 Miss. 77, 199 So. 273 (1940); Accord Myers v. Laird, 230 Miss. 675, 93 So.2d 828 (1957); Beasley v. Beasley, 177 Miss. 522, 171 So. 680 (1937).
We are of the opinion that a valid delivery of the deeds was made and the lower court committed reversible error in holding otherwise.

*1233 IV.
On August 30, 1983, John Lee deposited $32,072.46 to the joint checking account of Mr. Taylor and John Lee Taylor. This sum was derived from an oil, gas and mineral lease executed by John Lee on minerals conveyed to him by Mr. Taylor. The case will be remanded to the lower court to determine the equitable distribution of that sum, consistent with this opinion.
The judgment of the lower court is reversed and rendered here and remanded to the lower court.
REVERSED AND RENDERED AS TO PARTS I AND II. REVERSED AND REMANDED AS TO PARTS III AND IV.
PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
PITTMAN, J. dissents with separate written opinion joined by HAWKINS, DAN M. LEE, P.JJ., and BANKS, J.
PITTMAN, Justice, dissenting:
It is the rule of this Court that in appeals from chancery court, our scope of review is limited. We always review a chancellor's findings of fact, but will not disturb those findings unless such findings are manifestly wrong or clearly erroneous. Smith v. Dorsey, 599 So.2d 529, 533 (Miss. 1992); Bowers Window and Door Co., Inc. v. Dearman, 549 So.2d 1309, 1313 (Miss. 1989); Johnson v. Black, 469 So.2d 88, 90 (Miss. 1985). The standard has been explained as follows: whenever there is substantial evidence in the record to support the chancellor's findings of fact, those findings must be affirmed here. Smith v. Dorsey, 599 So.2d at 533 (emphasis added); Johnson v. Hinds County, 524 So.2d 947, 956 (Miss. 1988); Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983). On questions of law, however, this Court's scope of review is de novo. Planters Bank & Trust Co. v. Sklar, 555 So.2d 1024, 1028 (Miss. 1990). With the foregoing standards in mind, I would affirm the chancellor's decision in this case.
First, a plaintiff seeking to prove undue influence must show a confidential or fiduciary relationship existed between the grantor or testator and the grantee or devisee. This relationship "arises when a dominant, overmastering influence controls over a dependent person or trust justifiably reposed." Mullins v. Ratcliff, 515 So.2d 1183, 1191-92 (Miss. 1987). A fiduciary relationship "may arise in legal, moral, domestic or in a personal context where there is `overmastering influence' on the one side or `weakness, dependence or trust,' on the other." In re Will of McCaffrey, 592 So.2d 52, 60 (Miss. 1991) (citing Miner v. Bertasi, 530 So.2d 168, 170 (Miss. 1988)).
Where a confidential or fiduciary relationship is shown, a presumption of undue influence arises, which the party seeking to uphold the deed or will must rebut by clear and convincing evidence. In re Estate of Woodall, 593 So.2d 471, 476 (Miss. 1992); Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984). Affirmative, positive proof is needed to overcome this presumption. Murray, 446 So.2d at 578. Each case should be evaluated on its own facts. Cf. McCaffrey, 592 So.2d at 61.
Evidence in the case sub judice supports the chancellor's findings of a confidential relationship in regard to both the mineral deed and the 1984 deeds. After his wife's death in 1974, Mr. Taylor came to rely upon his son John Lee more and more. He placed John Lee's name on his checking and golden savings accounts and gave him access to the safe deposit box, supposedly in case he became ill due to his age. During the negotiations with the oil and gas lease, John Lee was the only family member involved, actually attending meetings with his father. He lived closer to his father than anyone else and was the only child who gave his father any substantial help on the farm. This close relationship continued through Mr. Taylor's death. John Lee wrote checks and paid bills for his father, borrowed money from him and involved him in John Lee's own business transaction with the Huddlestons. Those transactions themselves are evidence of the relationship of trust between Mr. Taylor and John Lee.
Once the confidential relationship is shown and the presumption of undue influence *1234 arises, the proponent of the instrument must prove by clear and convincing evidence the three prong test modified in Mullins v. Ratcliff:
1. Good faith on the part of the grantee/beneficiary;
2. Grantor's full knowledge and deliberation of his actions and their consequences; and
3. Independent consent and action on the part of the grantor/testator.
Mullins v. Ratcliff, 515 So.2d at 1193.
Murray v. Laird listed further factors which are helpful in determining these issues. On the good faith part of the test, the Court found important (a) the party who initiated the preparation of the instrument, (b) place of execution and those present, (c) consideration and fee paid for preparation, and by whom, and (d) secrecy or openness surrounding the execution. Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984).
Consideration of both transactions shows substantial evidence to support the finding that John Lee could not show good faith in either transaction. Of course, John Lee has only his testimony to support his contention that his father initiated both transactions. Mr. Taylor's usual lawyer was not used for either transaction. John Lee arranged all the pre-execution details, contacting the lawyers and providing the descriptions necessary. It unclear who paid for the mineral deed, but John Lee admitted he filled in the check for his father to sign to pay for the 1984 deeds. John Lee was present for execution of all the instruments, which none of the other family members knew of until after the fact.
Neither did John Lee prove independent consent and action. As to the mineral deed, the only evidence not coming from John Lee was Katherine's recollection of her conversation with Mr. Taylor after she found out about the mineral deed. Mr. Taylor told her that they couldn't get together then and he did not think that they could now. This hardly supports the conclusion that Mr. Taylor independently decided to just give all the mineral interest to John Lee. Other than that one statement, the evidence shows that John Lee served as his father's confidant and advisor at all pertinent times.
While the record shows evidence that Mr. Taylor may have been competent, the substantial evidence supports the chancellor's finding that a confidential relationship existed between Mr. Taylor and John Lee, and further, that John Lee did not rebut the presumption of undue influence. Because this Court has ignored the appropriate standard of review which it has previously adhered to time after time, I respectfully dissent from the majority opinion.
I am further compelled to point out this Court's inconsistency in applying the appropriate standard for reviewing chancery court judgments. In Whitworth v. Kines, 604 So.2d 225 (Miss. 1992), this Court voted to affirm a chancellor's decision which went against the overwhelming weight of the evidence. The reason? The elementary principle of law that this Court will not reverse a chancellor's factual findings unless the chancellor is manifestly in error or the findings are not supported by substantial evidence. As seen by the result in this present controversy, this Court's application of that principle is often arbitrary. Judicial reasoning such as this creates inconsistency in the body of law.
HAWKINS and DAN M. LEE, P.JJ., and BANKS, J., join this opinion.