GRIFFIS, J.,
for the Court.
¶ 1. Audrey S. McGee appeals the chancellor’s order that set aside the beneficiary changes made by her mother, Helen Neal Simpson, to her payable on death accounts (POD). On appeal, Audrey argues that: (1) she did not have a fiduciary relationship with Simpson, and (2) she never exercised undue influence over her. We find no error and affirm the chancellor’s findings.
FACTS
¶ 2. Simpson had five children: Alfred, Audrey, Kathryn, Olivia, and Willie. She died on March 5, 2005, at the age of eighty-six. On February 9, 2004, Simpson changed the beneficiaries on her accounts at Trustmark National Bank to heavily favor Audrey so that, at Simpson’s death, the beneficiaries of her four accounts at Trustmark were as follows: a Personal Money Market Account and two Certificates of Deposit payable on death to Audrey, and a Prime of Life Preferred Account payable on death to all five children. Prior to these changes, all five of her children were beneficiaries.
¶ 3. Simpson’s late husband allegedly fathered a daughter, Louise, twelve years before their marriage. In December 2003, the Simpson family learned that Louise was dying of cancer. Alfred, Kathryn, and Olivia went to visit her in the hospital. Louise’s daughter asked if they would agree to have their names listed in Louise’s obituary as her half siblings. Alfred, Kathryn, Olivia, and Willie agreed to be listed in Louise’s obituary. Due to past friction between Simpson and Louise, Olivia talked to her mother about her decision to be listed as Louise’s family in the obituary. Simpson said that was all before her time and made no objection. The next day, Simpson even went with two of her children to visit Louise in the hospital, and by all accounts, they had a very pleasant visit. Audrey was not asked to appear in the obituary. During this time, early to mid-December 2003, the record indicates no animosity between Simpson and Louise or Simpson and any of her children.
¶ 4. The overall testimony of Alfred, Kathryn, Olivia, and Willie was that until late December 2003, the Simpson family was a loving and committed family. Each also testified about Audrey’s tumultuous relationship with their mother. Money was a common issue between Audrey and Simpson; at times, then’ arguments resulted in physical violence between the two. Even though the children lived out of state for most of their adult lives, they visited often and spent holidays with their mother. Kathryn had moved back to Hattiesburg after her husband’s death to be closer to her mother. She testified that her mother often spent the night at her house, and they would spend the day together. Each *807 of her children described Simpson as a loving and tender mother.
¶ 5. The dynamics of the Simpson family abruptly changed in late December 2003. The family was planning to celebrate the new year at Olivia’s house in New Orleans. A few days before the celebration, Audrey confronted Alfred about the plan to be listed in Louise’s obituary and was very belligerent. The following day, Alfred went out for the day, and when he returned to his mother’s house, his mother’s attitude about Louise had changed dramatically. Audrey also called Olivia and was irate that Olivia had agreed to have her name in the obituary. Thirty minutes after Audrey called, Olivia got a call from her mother who was a “totally different person,” and Simpson told Olivia not to visit Louise or have anything to do with her. Simpson did not go to Olivia’s house as planned. Alfred tried to make amends with his mother a few days later, but he was unable to do so.
¶ 6. Louise died in January 2004. Willie attended her funeral, and Alfred, Kathryn, Olivia, and Willie were listed as her half siblings in her obituary. A few days after the funeral, Willie contacted his mother to let her know he was returning home to Ohio. During their conversation, the call was disconnected. When Willie called his mother back, Audrey got on the phone and at cursed at him. Willie and Kathryn decided to go to their mother’s home to talk to her. Audrey and her husband were at Simpson’s home. Audrey’s husband would not answer the door for Willie, but eventually, Audrey and Simpson did open the door. After a brief exchange at the door, Simpson went inside and returned with a gun. She pointed the gun at Willie’s head and pulled the trigger, but fortunately, the gun did not fire. There is testimony that Simpson followed Willie to his car and pointed the gun at him again. By her own testimony, Audrey did not try to defuse the situation.
¶ 7. A few days after this altercation, Alfred wrote his mother a letter detailing his disappointment and outrage concerning her behavior. The language of the letter was brutally honest and likely caused Simpson to have a strong emotional reaction. During this same time period, Simpson was driven by Audrey to Trust-mark to change her beneficiaries. According to Audrey, her mother had called her and asked her to come to Hattiesburg to take her to the bank. Audrey lived in New Orleans.
¶8. Simpson’s relationship with Alfred, Kathryn, Olivia, and Willie was very strained after these events, and their interactions were limited. Simpson threatened to call the police and charge Olivia with trespassing if she tried to visit her at her home. However, Simpson had moments where she acted as though nothing was wrong between her and her children, but all of these instances were when Audrey was not present. Prior to January 2004, Alfred, Kathryn, Olivia, and Willie played active roles in Simpson’s life. They helped her access her prescription insurance, helped her with bills, handled her lawn care, and had almost daily interactions with her. From January 2004 to September 2004, there was very little interaction between Simpson and Alfred, Kathryn, Olivia, and Willie.
¶ 9. Simpson fell in September 2004, and her health declined until her death in March 2005. Audrey took control of her mother’s care and finances in September 2004. After their mother became ill, there was a constant power struggle between Audrey and her siblings, which resulted in Simpson being transferred multiple times between hospitals in Hattiesburg and New Orleans, even being checked in under a false name. There was no testimony that *808 Simpson was belligerent toward Alfred, Kathryn, Olivia, or Willie from the time she fell until her death. Simpson called Olivia from the hospital and invited her and her siblings to visit. Olivia testified that her mother was her “old self’ during their conversation.
¶ 10. In February 2005, Kathryn and Willie became conservators for their mother and froze her bank accounts. After Simpson’s death, Audrey filed a petition to disburse the funds at Trustmark, and Trustmark filed a complaint for interpleader which placed the funds into the court. The chancellor found that Audrey had a fiduciary relationship with her mother and that she exercised undue influence over her mother. The chancellor set aside Simpson’s changes and ordered the accounts be paid according to the previous designation of beneficiaries.
STANDARD OF REVIEW
¶ 11. A chancellor’s findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. Sanderson v. Sanderson, 824 So.2d 623, 625(¶ 8) (Miss. 2002). This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 625-26(¶ 8).
ANALYSIS

1. Did Audrey have a fiduciary relationship with her mother, Simpson?

¶ 12. Audrey argues there was no evidence or testimony that she and Simpson had a confidential relationship in February 2004 when Simpson changed the beneficiaries on her accounts. The siblings respond that the relationship between Audrey and Simpson meets the definition of a confidential relationship given by the supreme court.
¶ 13. The supreme court defines a confidential relationship as:
Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter’s dependency upon the former, arising either from weakness of [the] mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character.
Madden v. Rhodes, 626 So.2d 608, 617 (Miss.1993) (citation omitted). “[T]he relationship must reflect ‘a dominant, overmastering influence [which] controls over a dependent person or trust justifiably reposed.’ ” Taylor v. Welch, 609 So.2d 1225, 1231-32 (Miss.1992) (quoting Mullins v. Ratcliff, 515 So.2d 1183, 1191-92 (Miss. 1987)). Factors to be considered in determining the existence of a confidential relationship are:
(1) [w]hether one person has to be taken care of by others, (2) [w]hether one person maintains a close relationship with another, (3) [w]hether one person is provided transportation and has [her] medical care provided for by another, (4) [w]hether one person maintains joint accounts with another, (5) [w]hether one is physically or mentally weak, (6) [whether one is of advanced age or poor health, and (7) [w]hether there exists a power of attorney between the one and another.
In re Estate of Sandlin v. Sandlin, 790 So.2d 850, 853(¶ 7) (Miss.Ct.App.2001).
¶ 14. After considering the seven factors, we find the chancellor did not abuse his discretion and was not manifestly wrong. Although the evidence presented was circumstantial, “[i]t follows, from the very nature of the thing, that evidence to show undue influence must be largely, in *809 effect, circumstantial.” Griffin v. Anna-na, 687 So.2d 1188,1194 (Miss.1996).
¶ 15. There is evidence that Simpson was taken care of by others, satisfying factor one. Prior to late December 2003, Alfred handled Simpson’s lawn care and helped with her prescription insurance and her bills. But in January 2004, all the children stopped supporting their mother, with the exception of Audrey. A logical conclusion is that Audrey took care of Simpson once Simpson stopped receiving this help from her other children.
¶ 16. There is also evidence of factors two and three. By Audrey’s testimony, she and her mother had a close relationship and talked every day. Audrey also drove Simpson to the bank to make the changes on her POD accounts in February 2004. Factor six is also satisfied. Simpson was of advanced age, eighty-six years old. She also pointed a gun at her son and pulled the trigger. According to all her children, this behavior was atypical.
¶ 17. The evidence shows that Simpson was in a confidential relationship with Audrey from September 2004 until her death. She was her mother’s primary care giver during her illness, managed her finances, and was the hospital’s only contact person for the majority of this time. There was substantial credible evidence that Audrey was in a position to exercise dominant control over Simpson due to her relationship, or lack there of, with her other children. The chancellor did not err by concluding that the relationship began nine months earlier when Simpson’s relationship with Alfred, Kathryn, Olivia, and Willie deteriorated and prior to Simpson changing her beneficiaries.

2. Did Audrey exercise undue influence over her mother, Simpson?

¶18. Audrey argues there was no evidence or testimony that she unduly influenced Simpson. In response, the siblings contend that their mother’s drastic change in behavior was due to Audrey’s presence, influence, and conduct.
¶ 19. A presumption of undue influence “extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority influence on the other.” In re Launius, 507 So.2d 27, 30 (Miss.1987) (overruled in part on other grounds) (citation omitted). The finding of a confidential relationship raised a rebuttable presumption of undue influence.
¶ 20. The supreme court has said that once “the circumstances give rise to a presumption of undue influence, then the burden of going forward with the proof shifts to the grantee/beneficiary.” Murray v. Laird, 446 So.2d 575, 578 (Miss.1984). The beneficiary must prove by clear and convincing evidence: “(l)[g]ood faith on the part of the grantee/beneficiary; (2)[g]rantor’s full knowledge and deliberation of his actions and their consequences; and (3)[a]dvice of (a) [a] competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator’s interest.” Id. (citations omitted).
¶21. In her brief, Audrey states that “there is no reason ... to discuss this issue” because her siblings failed to establish a confidential relationship. However, because we affirm the chancellor’s finding that a confidential relationship did exist, we look to the record for evidence that rebuts the presumption of undue influence. The only evidence that supports Audrey is her testimony that it was Simpson’s idea to change her beneficiaries and that she did not pressure her mother to do so. This evidence alone does not rebut the presumption of undue influence.
*810 ¶22. Having reviewed the record, we find there was sufficient evidence to support the chancellor’s finding that Audrey was acting in a fiduciary relationship with Simpson and that Audrey exercised undue influence over her mother. Our standard of review requires that we affirm the chancellor in the absence of manifest error, abuse of discretion, or error of law. Finding none here, we affirm the chancellor’s finding of undue influence and that the four accounts should be paid as Simpson had directed prior to the change.
¶ 23. THE JUDGMENT OF THE CHANCERY COURT OF FORREST COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J, LEE AND MYERS, P.JJ, IRVING, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.